Jake CORMAN, in his official capacity as Senator from the 34th Senatorial District of Pennsylvania and Chair of the Senate Committee on Appropriations; and Robert M. McCord, in his official capacity as Treasurer of the Commonwealth of Pennsylvania, Plaintiffs

v.

The NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 13, 2013.
Decided April 9, 2014.
Reargument Denied April 30, 2014.

Matthew H. Haverstick, Philadelphia, for plaintiff Senator Jake Corman.

Thomas W. Scott, Harrisburg, for defendant.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and LEADBETTER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge COVEY.

Senator Jake Corman (Senator Corman) and Treasurer Robert M. McCord (Treasurer McCord) (collectively, Plaintiffs) move this Court for judgment on the pleadings, seeking declaratory relief against the National Collegiate Athletic Association (NCAA). On January 4, 2013, Senator Corman filed a complaint with this Court against the NCAA and Timothy P. White (White), Chair of the NCAA-established Child Sexual Abuse Endowment Task Force. On February 20, 2013, Senator Corman filed an amended complaint against the NCAA and White. On March 27, 2013, Senator Corman, joined by Treasurer McCord, filed Plaintiffs' Second Amended Complaint (Plaintiffs' Second Amended Complaint) against the NCAA.

On April 23, 2013, the NCAA filed preliminary objections to Plaintiffs' Second Amended Complaint challenging Plaintiffs' standing, and contending that Pennsylvania State University (PSU) is an indispensable party whose absence deprived this Court of jurisdiction. The NCAA's preliminary objections also asserted that Count I of Plaintiffs' Second Amended Complaint failed to state a claim upon which relief can be granted and that the Institution of Higher Education Monetary Penalty Endowment Act (Endowment Act)[1] and the proffered construction of the act entitled "An Act to Accept Public Lands, by the United States, to the Several States, for the Endowment of Agricultural Colleges" (Act 10A)[2] violated the United States (U.S.) and Pennsylvania Constitutions.

On September 4, 2013, this Court issued an opinion and order overruling the NCAA's preliminary objections, and requiring the NCAA to file its answer to Plaintiffs' Second Amended Complaint within 20 days. *See Corman v. Nat'l Collegiate Athletic Ass'n,* 74 A.3d 1149 (Pa. Cmwlth.2013) (*Corman I*). On September 24, 2013, the NCAA filed its Answer with New Matter to Plaintiffs' Second Amended Complaint (Answer and New Matter) asserting, in addition to those legal issues raised in its preliminary objections, that the Endowment Act is unconstitutional special legislation and in violation of the Equal Protection Clause of the Fourteenth

---

1. Act of February 20, 2013, P.L. 1, 24 P.S. §§ 7501–7505.

2. Act of July 2, 2012, Supplement to Act of April 1, 1863, P.L. 213. The purpose of Act 10A is to make appropriations in order to implement the 1863 Act; to provide for a method of accounting for the funds appropriated; and to make an appropriation from a restricted account within the Agricultural College Land Scrip Fund. Plaintiffs' Second Amended Complaint, Ex. E at 1.

Amendment to the U.S. Constitution. On October 7, 2013, Plaintiffs filed their reply to the NCAA's Answer and New Matter (Reply to New Matter). Also on that day, Plaintiffs filed a joint motion for judgment on the pleadings (Motion). The NCAA filed its response to the Motion on October 28, 2013.

On October 29, 2013, this Court ordered the NCAA to brief its new matter issue that the Endowment Act is unconstitutional special legislation, as well as any other matter raised in its response to Plaintiffs' Motion. On November 20, 2013, the NCAA filed its brief in compliance with the October 29, 2013 Order. On December 2, 2013, Plaintiffs filed a reply brief. Before we can dispose of Plaintiffs' Motion, we must address the NCAA's issue as to whether the Endowment Act is special legislation and violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

Article III, Section 32 of the Pennsylvania Constitution prohibits the General Assembly from passing special legislation. Pa. Const. art. III, § 32. The Pennsylvania Supreme Court has explained:

Pennsylvania's proscription against local or special laws is currently found in Article III, Section 32, and was first adopted in the Pennsylvania Constitution of 1874. Like many constitutional provisions, it was adopted in response to immediate past abuses. The main purpose behind Article III, Section 32 was to put an end to the flood of privileged legislation for particular localities and for private purposes which was common in 1873. Over the years, the underlying purpose of Article III, Section 32 has been recognized to be analogous to federal principles of equal protection under the law, *see* U.S. Const. amend. XIV, § 1, and thus, special legislation claims and equal protection claims have been reviewed under the same jurisprudential rubric. The common constitutional principle at the heart of the special legislation proscription and the equal protection clause is that like persons in like circumstances should be treated similarly by the sovereign. Nonetheless, it is settled that equal protection principles do not vitiate the Legislature's power to classify, which necessarily flows from its general power to enact regulations for the health, safety, and welfare of the community, nor do these principles prohibit differential treatment of persons having different needs. As this Court explained in *Curtis [v. Kline,* 542 Pa. 249, 666 A.2d 265 (1995)]:

The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, provided that those classifications are reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation. In other words, a classification must rest upon some ground of difference, which justifies the classification and has a fair and substantial relationship to the object of the legislation.

*Curtis,* [542 Pa. at 255,] 666 A.2d at 268 (citations omitted). Thus, there are a legion of cases recognizing that a legislative classification which appears to be facially discriminatory may nevertheless be deemed lawful if the classification has a rational relationship to a legitimate state purpose. Furthermore ... legislative classifications must be founded on real distinctions in the subjects classified and not on artificial or irrelevant ones used for the purpose of evading the constitutional prohibition. Finally, in analyzing a special legislation/equal protection challenge, a reviewing court is free to hypothesize reasons the General As-

sembly might have had for the classification of certain groups.

*Pa. Tpk. Comm'n v. Commonwealth*, 587 Pa. 347, 363–64, 899 A.2d 1085, 1094–95 (2006) (citations, quotation marks and footnotes omitted); *see also Robinson Twp. v. Commonwealth*, —— Pa. ——, ——, 83 A.3d 901, 987–88 (2013).

The NCAA first argues that "the Endowment Act is *per se* unconstitutional because it creates an illusory class of one member that is closed or substantially closed to future membership." NCAA Memorandum in Response to the Court's October 29, 2013 Order (NCAA Memo) at 2 (quotation marks omitted). In support of its contention, the NCAA references the Endowment Act's legislative history, arguing that the Endowment Act was passed for the sole purpose of addressing the $60 million penalty the NCAA imposed upon PSU. It further asserts that because the Endowment Act, by its terms, applies only in specific limited situations[3] and Plaintiffs have not identified any other circumstances that would meet the Endowment Act's requirements, the applicable class is restricted to the instant case and "it is impossible to imagine that any other monetary penalty will ever qualify." NCAA Memo at 7. Finally, the NCAA contends that the Endowment Act itself creates a roadmap for a governing body and an institution of higher education to avoid its application and, therefore, it is unlikely that any such parties will voluntarily enter into an agreement with terms that will subject their agreement to the Endowment Act.

The law is well-established that "legislation will not be declared unconstitutional unless it clearly, palpably and plainly violates the Constitution, with any doubts being resolved in favor of constitutionality." *Harristown Dev. Corp. v. Dep't of Gen. Servs.*, 532 Pa. 45, 52, 614 A.2d 1128, 1132 (1992). "The party seeking to overcome the presumption of validity bears a heavy burden of persuasion." *W. Mifflin Area Sch. Dist. v. Zahorchak*, 607 Pa. 153, 163, 4 A.3d 1042, 1048 (2010).

Our Supreme Court has held that "a classification of one member is not unconstitutional so long as other members might come into that class." *Harristown Dev. Corp.*, 532 Pa. at 53 n. 9, 614 A.2d at 1132 n. 9. Thus, "a classification is *per se* unconstitutional when the class consists of one member and it is impossible or highly unlikely that another **can** join the class." *Harrisburg Sch. Dist. v. Hickok (Hickok)*, 563 Pa. 391, 398, 761 A.2d 1132, 1136 (2000) (bold and italics added).

A class is not closed merely because possible class members may choose to avoid actions that subject them to the law. Nor does the infrequent application of a law dictate that the class is closed. The Endowment Act applies to an institution of higher education which the Endowment Act defines as "[a] post[-]secondary educational institution in this Commonwealth that receives an annual appropriation from an act of the General Assembly." Section 2 of the Endowment Act, 24 P.S. § 7502. The Commonwealth has 14

---

**3.** Section 3(a) of the Endowment Act states: General rule.—If an institution of higher education pays a monetary penalty pursuant to an agreement entered into with a governing body and:

(1) the monetary penalty is at least $10,000,000 in installments over a time period in excess of one year; and

(2) the agreement provides that the monetary penalty will be used for a specific purpose,

then the monetary penalty shall be deposited into an endowment that complies with the provisions of subsection (b).

24 P.S. § 7503(a).

state-owned universities that the General Assembly funds through the State System of Higher Education by way of an annual general appropriations act.[4] In addition, 14 Pennsylvania community colleges receive annual appropriations from the General Assembly. Further, 4 state-related universities, including PSU, receive annual appropriations from the General Assembly. These 33 post-secondary educational institutions qualify as "[i]nstitution[s] of higher education" under the Endowment Act. 24 P.S. § 7502. Although it is unknown whether in the future an institution of higher education will reach an agreement with a governing body to pay a monetary penalty of at least $10 million, payable in installments, to be used for a specific purpose—it is clear that such circumstances **could** occur. Thus, others "**can** join the class." *Hickok*, 563 Pa. at 398, 761 A.2d at 1136 (emphasis added). Accordingly, the Endowment Act does not create a one-member class or a "substantially closed class" and, therefore, it is not *per se* unconstitutional.[5]

The NCAA also argues that the Endowment Act violates Article III, Section 32 of the Pennsylvania Constitution, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution because the classification created by the Endowment Act is not justified by a compelling state purpose nor is it rationally related to a legitimate governmental purpose.

The Pennsylvania Supreme Court has stated:

[T]he equal protection clause and the prohibition of special legislation are substantially similar. . . .

[u]nder a typical fourteenth amendment analysis of governmental classifications, there are three different types of classifications calling for three different standards of judicial review. The first type—classifications implicating neither suspect classes nor fundamental rights—will be sustained if it meets a 'rational basis' test. In the second type of

---

**4.** Thaddeus Stevens College of Technology also receives annual funding as part of a general appropriations act.

**5.** The Dissent contends that the Endowment Act constitutes *per se* special legislation and cites to cases to support its contention that the Endowment Act " 'creat[es] a class of one member that is ... **substantially closed** to future membership. . . .' " Dissenting Op. at 24 (quoting *W. Mifflin*, 607 Pa. at 163, 4 A.3d at 1048). Those cases are distinguishable because the classifications, effectively, could only apply to one member.

In *West Mifflin*, our Supreme Court found that Act 45 of 2007, Act of July 20, 2007, P.L. 278, No. 45 (Act 45), was *per se* special legislation. The Court recognized that only one school district met all of the criteria in the classification. Further, there were only five other school districts that could ever become class members, and they could become class members only if those school districts returned to board of control governance for five

consecutive years, and eliminated their high schools without reassigning their students to other school districts. Most importantly, the benefits of Act 45 only applied if remedial action was taken within fifteen days of the act's effective date, and thus, no other school districts could benefit from Act 45.

*Hickok* involved a classification of one. The classification at issue applied only to " 'a school district of the second class with a history of low test performance which is co-terminous with the city of the third class which contains the permanent seat of government.' " *Id.* at 397–98, 761 A.2d at 1136 (quoting Section 1707–B of the Education Empowerment Act (EEA), Act of March 10, 1949 P.L. 30, added by Act of May 10, 2000 P.L. 44, 24 P.S. § 1707–B). The Supreme Court found that the classification could **only** apply to the Harrisburg School District, rejecting the argument that the classification could apply to another school district since the capital could be relocated to another third class city at a future time.

cases, where a suspect classification has been made or a fundamental right has been burdened, another standard of review is applied: that of strict scrutiny. Finally, in the third type of cases, if 'important,' though not fundamental rights are affected by the classification, or if 'sensitive' classifications have been made, the United States Supreme Court has employed what may be called an intermediate standard of review, or a heightened standard of review. There are, in summary, three standards of review applicable to an equal protection case, and the applicability of one rather than another will depend upon the type of right which is affected by the classification.

[*James v. Se. Pennsylvania Transp. Auth.*, 505 Pa. 137, 145, 477 A.2d 1302, 1305–06 (1984).] Classifications in the area of commercial regulation are normally tested against the rational basis principle.

Likewise, our interpretations of the special legislation provision of the Pennsylvania constitution have given wide latitude to commercial regulation. In *DuFour [Dufour] v. Maize*, 358 Pa. 309, 56 A.2d 675 (1948), we upheld the Bituminous Coal Open Pit Mining Conservation Act [Act of May 31, 1945, P.L. 1198, 52 P.S. § 1396.1] ... against a challenge that it constituted special legislation by imposing conservation regulations on one type of coal mining and not others. The classification was held to be constitutional because it was based on real distinctions in the subjects classified. Similarly, we upheld a law requiring railroads, but not other common carriers, to adopt weekly pay periods where no collective bargaining agreement or employment contract provided otherwise[.]

. . . .

It is not necessary that the rational basis for a classification be set forth in the statute or in the legislative history. Nor is it necessarily incumbent upon the government agency to advance the reasons for the act in defending the classification. **The burden must remain upon the person challenging the constitutionality of the legislation to demonstrate that it does not have a rational basis. Should the reviewing court detect such a basis, from whatever source, the legislation must be upheld.**

*Pennsylvania Liquor Control Bd. v. Spa Athletic Club (Spa Athletic)*, 506 Pa. 364, 369–71, 485 A.2d 732, 734–35 (1984) (citations omitted; emphasis added).

The NCAA contends that the Endowment Act impairs a fundamental right—its right to freely contract—and therefore, the Endowment Act should only be upheld if the abridgement of its right to freely contract is justified by a compelling state purpose. However, more than 75 years ago, the U.S. Supreme Court recognized:

The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process.

. . . .

[F]reedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one wills or to contract as one chooses. . . .

This power under the Constitution to restrict freedom of contract has had many illustrations. That it may be exercised in the public interest with respect to contracts between employer and employee is undeniable. Thus statutes have been sustained limiting employment in underground mines and smelters to eight hours a day; in requiring redemption in cash of store orders or other evidences of indebtedness issued in the payment of wages; in forbidding the payment of seamen's wages in advance; in making it unlawful to contract to pay miners employed at quantity rates upon the basis of screened coal instead of the weight of the coal as originally produced in the mine; in prohibiting contracts limiting liability for injuries to employees; in limiting hours of work of employees in manufacturing establishments; and in maintaining workmen's compensation laws. In dealing with the relation of employer and employed, the legislature has necessarily a wide field of discretion in order that there may be suitable protection of health and safety, and that peace and good order may be promoted through regulations designed to insure wholesome conditions of work and freedom from oppression.

. . . .

[W]hen the individual health, safety, and welfare are sacrificed or neglected, the State must suffer.

*W. Coast Hotel Co. v. Parrish,* 300 U.S. 379, 391–394, 57 S.Ct. 578, 81 L.Ed. 703 (1937) (citations, quotation marks and footnote omitted). Accordingly, we reject the NCAA's assertion that the heightened standard of judicial review is appropriate herein.

Our Supreme Court in *Spa Athletic* ruled that "[c]lassifications in the area of commercial regulation are normally tested against the rational basis principle." *Id.* at 369, 485 A.2d at 734; *see also Price v. Cohen,* 715 F.2d 87, 92 (3d Cir.1983) ("regulations that have differing impacts on various types of commercial entities . . . violate the equal protection clause only if they are not rationally related to a legitimate state interest"). In the instant matter, the Binding Consent Decree Imposed by the National Collegiate Athletic Association and Accepted by the Pennsylvania State University (Consent Decree) expressly acknowledges that the fine amount was based upon the monies derived from a business enterprise. The Consent Decree provides that the $60 million fine is "equivalent to the approximate average of one year's gross revenue from the [PSU] football program. . . ." Consent Decree at 5. Thus, we review the Endowment Act's classifications under the rational basis standard.

The NCAA maintains that there is little, if any, connection between the Endowment Act's classifications and its asserted goal. It also contends that the Endowment Act's classifications do not meet the rational basis standard because the classifications are not rationally related to any valid governmental purpose.

Our Supreme Court has recently stated: [W]here a petitioner's challenge to an act is premised upon claims that discrete provisions of the act violate the Constitution, a proper analysis begins with the application of the law to the individual provisions challenged.

. . . .

[T]he required inquiry is into the effect of the provisions challenged . . . with respect to whether the admitted differ-

ent treatment ... rests upon some ground of difference that is reasonable rather than arbitrary and has a fair and substantial relationship to the object of each challenged provision.

*Robinson Twp.*, —— Pa. at ——, 83 A.3d at 988.

In support of its argument that the Endowment Act's classifications do not further the Endowment Act's purpose, the NCAA raises two points. First, the Endowment Act's alleged goal of controlling and monitoring the disposition of Commonwealth monies is contradicted by the Endowment Act's failure to limit its application to Commonwealth funds. However, the NCAA overlooks the fact that even if Commonwealth monies appropriated to an institution of higher education are not directly used to pay a monetary penalty under the Endowment Act, the monies expended to do so must be taken from the institution of higher education's budget. Consequently, the money used to pay the fine reduces the funds available to the institution for other purposes. Reality dictates that an institution of higher education's payment of a minimum $10 million penalty will burden the institution as a whole, as it would most organizations. The Endowment Act's lack of a requirement that the penalty payment come from Commonwealth funds, in no manner negates the impact of such a substantial monetary penalty on the entire institution. Accordingly, it is reasonable to conclude that the General Assembly was concerned with the burden on the Commonwealth's taxpayers resulting from such fines and, thus, drafted the Endowment Act to apply to monetary penalties paid by an institution of higher education, regardless of the source.

The NCAA's second point is that the Endowment Act's numerous and specific qualifications mirror the Consent Decree but do not, in any way, further the Endowment Act's alleged purpose. The NCAA correctly notes that Section 3(a) of the Endowment Act specifies the conditions which must be present to invoke its coverage: (1) there is an agreement; (2) between an "institution of higher education" and "a governing body"; (3) involving a monetary penalty of at least $10 million; (4) the penalty is payable in installments over more than one year; and (5) the agreement describes the specific purpose for the penalty. 24 P.S. § 7503(a). The NCAA contends that "[t]hese classifications are not only imprecise, they are so grossly underinclusive as to bear no rational nexus to the proffered government interest." NCAA Memo at 15 (quotation marks omitted).

Our Supreme Court has held:

Judicial review must determine whether any classification is founded on a real and genuine distinction rather than an artificial one. A classification, though discriminatory, is not arbitrary or in violation of the equal protection clause if any state of facts reasonably can be conceived to sustain that classification. **In undertaking its analysis, the reviewing court is free to hypothesize reasons the legislature might have had for the classification. If the court determines that the classifications are genuine, it cannot declare the classification void even if it might question the soundness or wisdom of the distinction.**

*Curtis*, 542 Pa. at 255–56, 666 A.2d at 268 (citations omitted; emphasis added). Accordingly, given the deference owed to the General Assembly when reviewing the challenged legislation's constitutionality, if this Court can detect any rational basis for the Endowment Act's classifications, the Endowment Act must be upheld. Importantly, "[t]he fact that a classification may

be underinclusive ... does not invalidate [a] statute since the legislature is not constitutionally required to eradicate an entire problem, but may proceed on a piecemeal basis." *Ass'n of Settlement Cos. v. Dep't of Banking*, 977 A.2d 1257, 1275 (Pa. Cmwlth.2009) (quoting *Donato v. State Bd. of Funeral Dirs.*, 168 Pa.Cmwlth. 177, 649 A.2d 207, 210 (1994)).

### The Endowment Act's Classifications

We will review each Endowment Act classification to determine whether it is rationally related to a legitimate state purpose.

### 1) An Agreement

■ Noting that the Endowment Act applies only to "agreements," and not to involuntarily-imposed fines, the NCAA contends that such a restriction is underinclusive in furthering the Endowment Act's purported purpose of protecting Commonwealth funds. Articles III and VIII of the Pennsylvania Constitution[6] confer upon the General Assembly the duty to preserve Commonwealth funds. "Control of state *finances* rests with the legislature, subject only to constitutional limitations[.]" *Leahey v. Farrell*, 362 Pa. 52, 57, 66 A.2d 577, 579 (1949).

The United States Supreme Court has stated:

> The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be

conditioned. Regulation of a business to prevent waste of the state's resources may be justified. And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency.

*Nebbia v. New York*, 291 U.S. 502, 527–28, 54 S.Ct. 505, 78 L.Ed. 940 (1934) (footnotes omitted).

As discussed above, the "agreement" involves a monetary penalty to be paid by an institution of higher education which receives Commonwealth monies, regardless of whether the fine is paid directly or indirectly with Commonwealth monies. The legislature has a duty to oversee and safeguard the use of the taxpayers' financial resources. The "agreement" is with a non-governmental body and thus its terms are not guided by an ordinance or statute. An "agreement" presumes the parties have some negotiating ability, and the Endowment Act serves to provide direction for said negotiations. Thus, it is reasonable for the legislature to impose restrictions where "institutions of higher education" **voluntarily** enter into **agreements** concerning a monetary punishment sought to be imposed by a non–governmental, "governing body."

### 2) The Agreement is Between an "Institution of Higher Education" and a "Governing Body"

■ The NCAA asserts that since the Endowment Act applies only to "governing bodies"[7] and "institutions of higher edu-

---

**6.** Article III of the Pennsylvania Constitution discusses the passage of laws including revenue and appropriation bills, restrictions on the disbursement of public funds and requirements regarding state purchases. Article VIII of the Pennsylvania Constitution pertains to taxation and finance matters including appropriations and the use of surplus funds.

**7.** The Endowment Act defines "[g]overning body" as "[a]n organization or legal entity with which an institution of higher education is associated and which body may impose a monetary penalty against the institution of higher education." 24 P.S. § 7502.

cation," the restriction is underinclusive because institutions of higher education may give away funds to other entities so long as they are not governing bodies. A "governing body" is unique in that it is a non-governmental organization and it may possess the authority to impose a monetary penalty upon state-funded institutions of higher education. An institution of higher education freely giving away funds is completely different than an institution of higher education paying money to a non-governmental entity that possesses the authority to **demand** payment. Because of the governing body's power to impose a substantial fine which necessitates the institution to use its funds to pay the penalty, it is reasonable that the General Assembly, given its authority over state finances and responsibility to safeguard Commonwealth funds, drafted the Endowment Act to regulate Commonwealth post-secondary educational institutions and governing bodies in instances where the educational institutions agree to pay monetary penalties as a result of the governing body's authority to demand payment. Accordingly, we find the classification to be "founded on a real and genuine distinction ... [not] an artificial one." *Curtis*, 542 Pa. at 255, 666 A.2d at 268.

### 3) *The Agreement Involves a Monetary Penalty of at Least $10 Million*

■ The United States Supreme Court has recognized:

> [T]he legislative authority, acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach. The Legislature is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest. If the law presumably hits the evil where it is most felt, it is not to be

overthrown because there are other instances to which it might have been applied. There is no 'doctrinaire requirement' that the legislation should be couched in all embracing terms.

*W. Coast Hotel*, 300 U.S. at 400, 57 S.Ct. 578 (quotation marks omitted). The manner in which an institution of higher education expends its available funds is guided by the organization's bylaws, internal operating procedures and prudent business judgment. However, the imposition of a monetary penalty by a non-governmental body upon an institution of higher education is not controlled by the institution. Thus, it is reasonable for the Endowment Act to apply only to agreements involving monetary penalties. Moreover, application of the Endowment Act to each and every monetary penalty imposed by a governing body upon an institution of higher education, no matter how small, would be administratively burdensome and costly for the Commonwealth. In addition, a monetary penalty of at least $10 million will have a significant impact upon a post-secondary educational institution's operating budget and consequently, the Commonwealth's budget considerations in determining the level of appropriations to the institution of higher education.[8] We, therefore, find this classification to be reasonable.

### 4) *The Penalty is Payable in Installments Over More Than One Year*

■ The NCAA maintains that the Endowment Act's applicability to agreements involving money to be paid in installments over a period of more than one year creates an underinclusive class since there is no rational reason to restrict the classification to agreements involving installment payments. The U.S. Supreme Court stat-

---

**8.** The NCAA penalty imposed upon PSU was six times the $10 million minimum fine neces-sary to trigger application of the Endowment Act.

ed, "[t]he legislature is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest." *W. Coast Hotel*, 300 U.S. at 400, 57 S.Ct. 578 (quotation marks omitted). As we concluded above, the fact that the Endowment Act applies to a monetary penalty involving at least $10 million is reasonable. In direct correlation to the minimum $10 million penalty is the economic reality and well-established commercial practice that large debts, such as commercial mortgages, residential mortgages, car loans, and even college loans are typically paid in installments over more than one year.

In addition, this classification is consistent with the fact that the Commonwealth prepares its budget and the General Assembly makes its appropriations to the 33 Commonwealth state-owned and state-related colleges and universities annually. This requirement permits the General Assembly to assess the fiscal impact of the monetary penalty at the same time it prepares the budget and determines its annual appropriation to institutions of higher education. Moreover, the Endowment Act's applicability to penalties paid in installments over more than one year permits the General Assembly to consider annually the impact of endowment expenditures to child sexual abuse prevention and treatment in assessing state funding needs during budget preparations. Because a minimum $10 million fine can and most likely will impact the fiscal health of an institution of higher education and would not be payable all at once, it is reasonable for the General Assembly to subject these types of agreements to the Endowment Act.

### 5) *The Agreement Describes the Specific Purpose for the Penalty*

██ The NCAA asserts that there is no rational basis for the Endowment Act's applicability only to agreements which dictate that the penalty be used for a specific purpose. The Endowment Act reads that if "the agreement provides that the monetary penalty will be used for a specific purpose, then the monetary penalty shall be deposited into an endowment that complies with the provisions of subsection (b)." 24 P.S. § 7503(a)(2). The Endowment Act's "specific purpose" requirement recognizes that the institution of higher education and governing body have agreed to use the money in a certain manner and because of the large sum involved, safeguards the use of that money by placing it in a trust. Subsection (b) delineates the endowment requirements, thereby ensuring that said monetary penalty is used for the "specified purpose."

As discussed above, the Endowment Act applies only to Commonwealth-funded colleges and universities. The General Assembly is responsible for appropriations to these post-secondary educational institutions. The majority of students that matriculate at these colleges and universities are Pennsylvania residents and therefore their tuition is paid for by Pennsylvania taxpayers. Most Pennsylvania residents receive an in-state reduced tuition which is subsidized by the Commonwealth. Where a non-governmental organization determines that a monetary penalty of at least $10 million is to be imposed on one of these Commonwealth institutions of higher education, the Commonwealth has an interest in the specific purpose for which that fine will be used. Although there are many reasons for the Commonwealth's interest, among the most important are the need to know what conduct occurred, whether it occurred on a state funded post-secondary educational institution which Pennsylvania taxpayers are financially supporting, and whether corrective

measures, safeguards or other changes are to be implemented. Of critical import to the Endowment Act is the fact that the **monies** being paid are **penal in nature.** Consequently, the General Assembly must reassess its level of appropriations to that particular institution based on the conduct giving rise to the penalty in relationship to the Commonwealth's budget considerations. "Regulation of a business to prevent waste of the state's resources may be justified. And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency." *Nebbia,* 291 U.S. at 528, 54 S.Ct. 505.

The NCAA argues that even if the Endowment Act is found to be constitutional, it directs the monetary penalty to the state treasury to be used by charitable organizations addressing child sexual abuse and not back to the institution of higher education in furtherance of the original appropriation. However, Section 3(b)(4) of the Endowment Act states that:

> **Unless otherwise expressly stated in the agreement,** the funds may only be used within this Commonwealth for the benefit of the residents of this Commonwealth and on any of the following:
>
> (i) Programs or projects preventing child sexual abuse and/or assisting the victims of child sexual abuse.
>
> (ii) Multidisciplinary investigative teams established under 23 Pa.C.S. (relating to domestic relations).
>
> (iii) Child advocacy centers.
>
> (iv) Victim service organizations that provide services to children subjected to sexual abuse.

> (v) Training of persons who are mandated by law to report child sexual abuse or to treat victims of child sexual abuse.

24 P.S. § 7503(b)(4) (emphasis added). Thus, the parties' agreement controls the purpose of the endowment. Where the agreement's specific purpose is not consistent with Section 3(b)(4) of the Endowment Act, the fine monies must be used for the purpose set forth in the agreement. However, where the specific purpose of the monetary penalty is consistent with the uses enumerated in Section 3(b)(4) of the Endowment Act, such as "charity" or to benefit "children," the money may only be used for the reasons listed in Section 3(b)(4) of the Endowment Act. The Commonwealth has a strong interest in preventing child sexual abuse and assisting the victims of such abuse. This governmental interest to protect the safety, health and welfare of children was further pronounced as a result of Jerry Sandusky's (Sandusky) horrific criminal acts committed against children on the premises of a state-related institution of higher education. Consequently, the General Assembly "hit[ ] the evil where it [was] most felt, [thus, the law] is not to be overthrown because there are other instances to which it might have been applied." *W. Coast Hotel,* 300 U.S. at 400, 57 S.Ct. 578. The legislature's remedial steps in furtherance of its governmental duty to protect children by directing that in specified situations monies are to be used in the prevention of and treatment for child sexual abuse is rationally related to a legitimate state interest.[9]

9. The NCAA cited in its brief and attached as an exhibit thereto, a copy of the Big Ten Council of Presidents and Chancellors (COPC) Statement on Penn State University (PSU). That document recited that after consultation with the NCAA's counsel, COPC elected to use the approximately $13 million from the Big Ten Conference bowl revenues which PSU was prohibited from receiving to support "charitable organizations **in Big Ten**

As recently stated by our Supreme Court:

> [A]cts passed by the General Assembly are strongly presumed to be constitutional, including the manner in which they were passed.... **If there is any doubt that a challenger has failed to reach this high burden, then that doubt must be resolved in favor of finding the statute constitutional.**

*Pa. State Ass'n of Jury Comm'rs v. Commonwealth*, 619 Pa. 369, 380, 64 A.3d 611, 618 (2013) (citations and quotation marks omitted; emphasis added). "Where ... there are plausible reasons for [the legislature's] action, our inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislation,' because this Court has never insisted that a legislative body articulate its reasons for enacting a statute." *Price*, 715 F.2d at 94 (quoting *U.S. R.R. Ret. Bd.*

*v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (citations omitted)). In light of the fact that the effect of each questioned qualification "is reasonable rather than arbitrary and has a fair and substantial relationship to the object of each challenged provision[,]" we must conclude that the Endowment Act is not unconstitutional special legislation. *Robinson Twp.*, —— Pa. at ——, 83 A.3d at 988.[10]

■ Having decided the special legislation issue, we now address Plaintiffs' Motion. This Court has recognized that:

> A motion for judgment on the pleadings filed in an action in this Court's original jurisdiction is in the nature of a demurrer. A motion for judgment on the pleadings may be granted only when there is no genuine issue of fact, and the moving party is entitled to judgment as a matter of law.

---

communities dedicated to the protection of children." Exhibits to NCAA Memo, Exhibit F (emphasis added). Therein, the COPC stated:

> In December 2011, Big Ten legal counsel, along with NCAA counsel, engaged in the independent investigation undertaken by Louis Freeh and his law firm, Freeh, Sporkin, & Sullivan, LLP....
> [T]he COPC has voted to impose the following additional sanctions on [PSU], effective immediately:
> ....
> 4. Fine: Because [PSU] will be ineligible for bowl games for the next four years, it will therefore be ineligible to receive its share of Big Ten Conference bowl revenues over those same four years. That money, estimated to be **approximately $13 million,** will be **donated to** established **charitable organizations** *in Big Ten communities* **dedicated to the protection of children.**

*Id.* (emphasis added). Notably, the COPC acted in a similar manner as the Pennsylvania General Assembly in seeking to protect children and designating how its financial resources would be used by limiting the distribution of funds to particular communities for the specific purpose of protecting children.

10. The Dissent disagrees with the Majority's holding for two reasons. First, "because of the pleadings in this case and **public comments by the sponsor of the bill** that it insures that the $60 million fine imposed under the Consent Decree for matters addressing child abuse can only be spent in Pennsylvania." Dissenting Op. at 24 (emphasis added). However, no bill becomes law of this Commonwealth through a single Senator. The Endowment Act became law after both the House of Representatives and Senate, collectively the Pennsylvania General Assembly, by majority vote approved it and Governor Corbett signed it into law. Second, the "Act provisions track provision by provision the Consent Decree ... which, itself, makes it 'highly unlikely' that the Endowment Act will ever apply to an[other] agreement...." Dissenting Op. at 24. This reason is not the legal standard by which the constitutionality of a statute is determined. Relying upon the controlling precedent, the Majority thoroughly analyzed the legal standard based upon the pleadings herein. The fact that legislation is enacted in response to a particular situation is well-recognized, accepted and does not change the applicable legal analysis.

*Pa. Soc. Servs. Union, Local 688 v. Commonwealth,* 59 A.3d 1136, 1142 (Pa. Cmwlth.2012) (citation omitted). The NCAA in its Answer and New Matter, *inter alia,* denied and stated that it was without sufficient knowledge to answer the allegations, and alleged facts to which Plaintiffs denied and/or denied with strict proof demanded at trial. These allegations and denials present factual disputes relating to the NCAA's authority to impose the sanctions and the validity of the Consent Decree. In particular, the NCAA alleged:

> [PSU] gave and received valuable, bargained-for consideration as a party to the Consent Decree....
>
> ....
>
> All members of the NCAA 'accept and observe the principles set forth in the constitution and bylaws of the Association'....
>
> NCAA members agree that a member institution that commits a 'major violation' of the NCAA Constitution or Bylaws shall receive a severe penalty, which may include, inter alia, '[p]rohibition against specified competition in [a] sport,' ... or a '[f]inancial penalty[.]'....
>
> In part to avoid a prolonged NCAA investigation and NCAA hearings, [PSU] entered into the Consent Decree, which constitutes a binding contract between the NCAA and [PSU].
>
> ....
>
> Plaintiffs' Second Amended Complaint should be dismissed because the NCAA was justified in entering into the Consent Decree with [PSU].
>
> Plaintiffs' Second Amended Complaint should be dismissed because the NCAA

had a privilege to enter into the Consent Decree with [PSU].

> Plaintiffs' Second Amended Complaint should be dismissed because the NCAA acted in good faith.
>
> The NCAA imposed sanctions through the Consent Decree in response ... [to] conduct [in] violation of the NCAA's Constitution and Bylaws.

Answer and New Matter, ¶¶ 96, 103–105, 137–140 (paragraph numbers omitted).

The Consent Decree expressly recognizes the NCAA's questionable involvement in and its dubious authority pertaining to a criminal action against a non-university official which involved children who were non-university student-athletes. The Consent Decree recites that "[t]he sexual abuse of children on a university campus by a **former** university **official** ... while despicable, ordinarily would **not be actionable by the NCAA.**" Consent Decree at 4 (emphasis added).

The NCAA Constitution pronounces the NCAA's "Basic Purpose" as:

> The competitive athletics programs of member institutions are designed to be a vital part of the educational system. A **basic purpose of this Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.**

NCAA Exhibits to Memo in Support of Preliminary Objections to Second Amended Complaint, Exhibit F, NCAA Constitution and Bylaws (NCAA Constitution and Bylaws), Article 1.3.1 (emphasis added).[11]

---

11. NCAA Exhibits to Memo in Support of Preliminary Objections to Second Amended Complaint, Exhibit F does not include the text of Article 1.3.1 of the Constitution and Bylaws; it does however contain the table of contents and the entirety of Article 19, En-

The NCAA Constitution and Bylaws further provides that where a member institution has been found to be in noncompliance with the NCAA's rules and regulations "[t]he Association shall ... afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance." NCAA Constitution and Bylaws, Article 2.8.2 (emphasis added). In such circumstances where a member institution fails to fulfill its obligations, Article 1.3.2 and Article 19 of the NCAA Constitution and Bylaws, state that its enforcement procedures shall govern.

The Mission of the NCAA Enforcement Program reads, in pertinent part:

**The program is committed to fairness of procedures** and the timely and equitable resolution of infractions cases. **The achievement of these objectives is essential** to the conduct of a viable and effective enforcement program. Further, **an important consideration in imposing penalties is to provide fairness to uninvolved student-athletes, coaches, administrators, competitors and other institutions.**

NCAA Constitution and Bylaws, Article 19.01.1 (emphasis added).

The Consent Decree pronounced:

**[T]he NCAA has determined** that [PSU]'s **sanctions** be designed **to** not only **penalize [PSU]** ... but **also** to **change the culture** that allowed this activity to occur.... **Moreover, the NCAA recognizes that in this instance no student-athlete is responsible for these events and, therefore, the NCAA has fashioned its sanctions in consideration of the potential impact on all student-athletes. To wit, after serious consideration and significant discussion, the NCAA has determined not to impose the so-called 'death penalty.'**[12] While **these circumstances certainly are severe,** the suspension of competition is most warranted when the institution is a repeat violator and has failed to cooperate or take corrective action. **[PSU] has never before had major NCAA violations**.... [13]

Consent Decree at 4 (emphasis added). The Consent Decree's stated **"appropriate remedy ... which benefits current and**

---

forcement. The NCAA's Constitution and Bylaws total 444 pages.

12. The "death penalty" bans a school from competing in a sport for at least one year. NCAA Constitution and Bylaws, Article 19.5.2.1.2, entitled **"Repeat–Violator Penalties,"** states:

A repeat violator shall be subject to enhanced major violation penalties and any or all of the following additional penalties:

(a) The prohibition of some or all outside competition in the sport involved in the latest major violation for a prescribed period as deemed appropriate by the Committee on Infractions and the prohibition of all coaching staff members in that sport from involvement directly or indirectly in any coaching activities at the institution during that period;

(b) The elimination of all initial grants-in-aid and all recruiting activities in the sport involved in the latest major violation in question for a prescribed period;

(c) The requirement that all institutional staff members serving on the Board of Directors, Leadership Council, Legislative Council or other cabinets or committees of the Association resign those positions, it being understood that all institutional representatives shall be ineligible to serve on any NCAA committee for a prescribed period; and

(d) The requirement that the institution relinquish its voting privilege in the Association for a prescribed period.

13. PSU has been a NCAA member since 1908. NCAA Answer and New Matter, ¶ 102.

future [PSU] students, faculty and staff[,]"[14] reads as follows:

### A. *Punitive Component*

*$60 million fine.* The NCAA imposes a $60 million fine, equivalent to the approximate average of one year's gross revenue from the [PSU] football program. . . .

*Four-year postseason ban.* The NCAA imposes a four-year ban on participation in postseason play in the sport of football, beginning with the 2012–2013 academic year and expiring at the conclusion of the 2015–2016 academic year. Therefore, [PSU]'s football team shall end its 2012 season and each season through 2015 with the playing of its last regularly scheduled, in-season contest and shall not be eligible to participate in any postseason competition, including a conference championship, any bowl game, or any post-season playoff competition.

*Four-year reduction of grants-in-aid.* For a period of four years commencing with the 2013–2014 academic year and expiring at the conclusion of the 2016–2017 academic year, the NCAA imposes a limit of 15 initial grants-in-aid (from a maximum of twenty-five allowed) and for a period of four years commencing with the 2014–2015 academic year and expiring at the conclusion of the 2017–2018 academic year a limit of 65 total grants-in-aid (from a maximum of 85 allowed) for football during each of those specified years. In the event the number of total grants-in-aid drops below 65, [PSU] may award grants-in-aid to non-scholarship student-athletes who have been members of the football program as allowed under Bylaw 15.5.6.3.6.

*Five years of probation.* The NCAA imposes this period of probation, which will include the appointment of an on-campus, independent Integrity Monitor and periodic reporting as detailed in the Corrective Component of this Consent Decree. Failure to comply with the Consent Decree during this probationary period may result in additional, more severe sanctions.

*Vacation of wins since 1998.* The NCAA vacates all wins of the [PSU] football team from 1998 to 2011. The career record of Coach "Joe" Paterno will reflect the vacated records.[15]

Consent Decree at 5.

The NCAA Constitution and the Bylaws Enforcement Program mandate the NCAA in situations of alleged noncompliance to **"afford ... fair procedures"** and **"provide fairness to uninvolved student-athletes, coaches, administrators, competitors** [16] **and other institutions."** NCAA Constitution and Bylaws, Article 2.8.2, Article 19.01.1 (emphasis added). The NCAA Constitution and Bylaws then delineates and diagrams the required notices of charges, investigations, hearing committees in a specified order and appeal procedures. The NCAA Enforcement Program also details the types of violations and applicable penalties therefor. It further denotes that the "death penalty" applies only to repeat violators. NCAA Constitution and Bylaws, Article 19.5.2.1.2. "[T]he

---

14. Consent Decree at 1 (emphasis added).

15. The NCAA's Constitution pronounces that one of its purposes is "to **preserve** intercollegiate athletics records." NCAA Constitution and Bylaws, Article 1.2 (emphasis added).

16. The NCAA's Bylaw entitled "The Principle of Competitive Equity," reads: "The structure and programs of **the Association ... shall promote** opportunity for **equity in competition** to assure that individual **student-athletes** and institutions **will not be prevented unfairly from achieving the benefits inherent in participation in intercollegiate athletics."** NCAA Constitution and Bylaws, Article 2.10 (emphasis added).

by-laws constitute the contract between the stockholders and are subject to the rules governing a written contract signed by all the parties. It follows that **contracting parties cannot ignore their own contractual covenants with impunity and still seek to hold the others to the contract[.]**" *Elliott v. Lindquist,* 356 Pa. 385, 388, 52 A.2d 180, 182 (1947) (quotation marks omitted; emphasis added). Based upon the parties' pleadings and given the many discrepancies between the Consent Decree and the NCAA Constitution and Bylaws, there exists genuine factual disputes. Accordingly, this Court must deny Plaintiffs' Motion.

■ In *Corman I,* this Court ruled that PSU was not an indispensable party to resolve the controversy then before us. At that time, the NCAA's authority was not questioned nor the validity of the Consent Decree, as neither party had raised it, and therefore, this Court held PSU was not an indispensable party, and its absence did not deprive this Court of jurisdiction. Thereafter, the NCAA filed its Answer and New Matter and alleged "material facts which are not merely denials of the averments of the preceding pleading." Pa. R.C.P. No. 1030(a). These allegations and denials thereto present factual issues directly relating to, *inter alia,* the NCAA's Constitution and Bylaws concerning its authority to impose the monetary penalty, whether the NCAA acted in accordance with its Constitution and Bylaws, the validity of the Consent Decree and whether the NCAA acted in good faith.[17] Because the NCAA's Answer and New Matter expanded the scope of Plaintiffs' Second Amended Complaint, no objection having been made, PSU must be joined as a party.

■ The law of this Commonwealth is well-established: "'[J]urisdiction once acquired is not defeated by subsequent events, even though they are of such a character as would have prevented jurisdiction from attaching in the first instance.'"[18] *Get Set Org. v. Philadelphia Fed'n of Teachers,* 446 Pa. 174, 181 n. 6, 286 A.2d 633, 636 n. 6 (1971) (quoting 10 Pennsylvania Law Encyclopedia, Courts, § 21 (2013)). "'Once the jurisdiction of a court attaches, it exists for all times until the cause is fully and completely determined.'" *Id.* (quoting *Com. ex rel. Milne v. Milne,* 149 Pa.Super. 100, 26 A.2d 207 (1942)); *see also J.H. France Refractories Co. v. Allstate Ins. Co.,* 521 Pa. 91, 555 A.2d 797 (1989) (holding that because all parties having claims at the time of filing were joined in the declaratory judgment action, the common pleas court had jurisdiction over the actions despite subsequent claims filed by additional claimants); *In re Estate of Moore,* 871 A.2d 196 (Pa.Super.2005) (In a dispute over the sale of

---

17. The Dissent also notes that "PSU is a non-profit corporation as well as being tax-exempt as a charitable organization, and that Boards of Directors of non-profit charitable corporations have a fiduciary duty to ensure that funds are only used for matters related to its charitable purpose-in this case, the students of PSU. *See* 15 Pa.C.S. § 5712.... *See Zampogna v. Law Enforcement Health Benefits, Inc.,* 81 A.3d 1043, 1047 (Pa.Cmwlth.2013)." Dissenting Op. at 23. Plaintiffs alleged and the NCAA stated that it was without sufficient knowledge to determine the truth and denied that "[PSU] receives ... tax benefits as a state non-profit...." Plaintiffs' Second Amended Complaint, ¶ 45 and NCAA's Answer and New Matter, ¶ 45.

18. The Dissent contended in *Corman I* that PSU was an indispensable party. This Court, however, found otherwise and accordingly, that it had jurisdiction. The Dissent again raises the same issue. As discussed, *infra,* the NCAA's Answer and New Matter has expanded the issues before this Court, thus, necessitating PSU's involvement.

estate property, after the buyer initiated the action, administratrix transferred the subject estate property to herself as an individual, and then claimed that the trial court lacked jurisdiction over the matter because buyer had failed to join her individually as an indispensable party. The Court concluded that once jurisdiction had attached, the administratrix's subsequent action did not defeat jurisdiction). In the instant matter, because this Court had jurisdiction at the time the action was initiated, it retains jurisdiction over the case until the matter has been fully and completely determined.

■■■ The Dissent contends that the Consent Decree's validity is not before us, and thus we may not address it. To the contrary, the law is well-established that allegations contained in new matter which are denied place those disputed issues before the Court. *See, e.g., In re Estate of Kelly,* 473 Pa. 48, 373 A.2d 744 (1977); *Callery v. Blythe Twp. Mun. Auth.,* 432 Pa. 307, 243 A.2d 385 (1968); *Dep't of the Auditor General v. Pennsylvania State Police,* 844 A.2d 78 (Pa.Cmwlth.2004); *Holland v. Norristown State Hosp.,* 136 Pa.Cmwlth. 655, 584 A.2d 1056 (1990); *Hall v. Middletown Twp. Delaware Cnty. Sewer Auth.,* 75 Pa.Cmwlth. 181, 461 A.2d 899 (1983). The NCAA's New Matter and Plaintiffs' Reply to New Matter placed disputed issues before this Court. Plaintiffs did not file preliminary objections or otherwise attempt to strike the NCAA's Answer and New Matter. Accordingly, these factual disputes must be addressed.

The Dissent maintains that the only dispute before the Court is the "applicability of the Endowment Act to the expenditure of funds owed under that agreement." Dissenting Op. at 23. That was true before the NCAA filed its Answer and New Matter, wherein, it alleged that the Consent Decree is supported by valuable, bargained for consideration and that the Consent Decree is a binding contract. It was also true before the NCAA alleged it was justified and had a privilege to enter into the Consent Decree, that it acted in good faith and that it "imposed sanctions through a Consent Decree in response . . . [to] conduct [in] violation of the NCAA's Constitution and Bylaws." Answer and New Matter, ¶ 140.

The genesis for the sanctions arose from horrific conduct that occurred in this Commonwealth. It started with the unthinkable acts of Sandusky against our most innocent—children. The children harmed by Sandusky, the children's family members, the community, PSU and the Commonwealth were all seeking to uncover the truth behind these hideous crimes when although "ordinarily . . . not . . . actionable by the NCAA," the NCAA involved itself in one of the most disastrous events in these children's lives and that of their families as well as the history of the community, PSU and the Commonwealth. Consent Decree at 4. While acknowledging that "no student-athlete is responsible for these events," the NCAA imposed sanctions "designed to . . . penalize [PSU] . . . [and] change the culture" (Consent Decree at 4) "which [remedy] benefits current and future [PSU] students, faculty and staff." Consent Decree at 1. The sanctions' "Punitive Component" removed $60 million from a state-related post-secondary educational institution which the NCAA asserts it is to control. High school athletes who had no involvement in the criminal acts were prevented from obtaining a free college education. Student-athletes, trainers, coaches and support personnel who were taught and trained to be and do their best were stopped from competing and student-athletes from other colleges and universities were also precluded from competing against them by the prohibition against

post-season play. Student-athletes, trainers, coaches, administrators and support personnel who had excelled in their jobs through hard work, practice, commitment, team work, sportsmanship, excellence and perseverance were told none of that mattered.

This Court will not make a legal determination which has such far reaching implications without conducting a hearing on the disputed factual issues. Therefore, pursuant to Pennsylvania Rule of Civil Procedure 2232(c), PSU is joined as a party to the instant litigation. In accordance with this Court's Order, Plaintiffs and the NCAA are directed to serve PSU with Plaintiffs' Second Amended Complaint and Reply to New Matter, and Answer and New Matter, respectively.

For all of the above reasons, this Court concludes that the Endowment Act is not special legislation, Plaintiffs' Motion is denied, and PSU is joined as a party.

### ORDER

AND NOW, this 9th day of April, 2014, Pennsylvania State University (PSU) is joined as a party in this action. Senator Jake Corman and Treasurer Robert M. McCord (Plaintiffs) are directed to serve Plaintiffs' Second Amended Complaint and Reply to Defendant the National Collegiate Athletic Association's (NCAA) New Matter upon PSU within 7 days of this Court's Order, and the NCAA is directed to serve its Answer to Plaintiffs' Second Amended Complaint and New Matter (Answer and New Matter) upon PSU within 7 days of this Court's Order. PSU is directed to enter an Appearance and file an appropriate responsive pleading to Count I of Plaintiffs' Second Amended Complaint and the NCAA's New Matter within 20 days of service of Plaintiffs' Second Amended Complaint and the NCAA's Answer and New Matter.

Plaintiffs' Motion for Judgment on the Pleadings is denied.

Judge SIMPSON concurs in the result only.

Judges COHN JUBELIRER and BROBSON did not participate in the decision in this case.

DISSENTING OPINION BY President Judge PELLEGRINI.

Even though it would give me pleasure to join with the majority because I share the concerns with the process by which the Consent Decree was entered, I am compelled not to do so for the reasons expressed below.

### I.

This matter is presently before us on a Joint Motion for Judgment on the Pleadings filed by Plaintiffs. In their Joint Motion, Plaintiffs asked us to enter judgment on the pleadings and enter the following relief:

(1) A declaration that the Endowment Act is a valid and constitutional law;

(2) A declaration that the NCAA has violated the Endowment Act;

(3) A declaration that the entirety of the monetary penalty in the Consent Decree be paid to the State Treasury;

(4) An order compelling the NCAA to immediately pay or direct payment of the first $12 million installment to the State Treasury;

(5) An injunction compelling compliance by the NCAA with the Endowment Act; and

(6) Such other relief as this Court deems just and proper.

In its response to Plaintiffs' Joint Motion for Judgment on the Pleadings, the NCAA set forth its interpretation of our

holdings in *Corman v. Nat'l Collegiate Athletic Ass'n,* 74 A.3d 1149 (Pa.Cmwlth. 2013) (*Corman I*) and stated:

> [T]o the extent the above-holdings constitute final, settled conclusions by this Court—and not merely determinations that were preliminary or contingent on as-yet undeveloped facts—then it appears the Court has already held as a matter of law (and wrongly, in the NCAA's view) that (1) the Endowment Act has been triggered under the current circumstances and (2) that the Endowment Act does not violate the U.S. or Pennsylvania Constitutions. Ultimately, this Court is in the best position to evaluate the scope and import of its prior decision. If the Court views the September 4 Order as fully resolving all outstanding issues as a matter of law, then—despite the NCAA's strong disagreement with that Order—the proceedings before this Court may well be at an end.

(NCAA's October 28, 2013 Response to Plaintiffs' Motion for Judgment on the Pleadings at 3–4).

However, because the NCAA's New Matter contained a defense that the Endowment Act was special legislation within the meaning of Article III, Section 32 of the Pennsylvania Constitution, an issue we had not previously addressed, we could not grant the Motion. Instead, we issued an order that the parties address the "issue raised in its New Matter that the Endowment Act is an unconstitutional special law, as well as any matter raised in its Response to Plaintiffs' Motion for Judgment on the Pleadings." In response to that order, the parties addressed only two issues: that the Endowment Act was *per se* unconstitutional and that there was no ra-

tional basis for the classification created by this legislation.

The majority, however, does not limit itself to issues that were addressed by the parties. On its own, it finds that we cannot grant the Motion because there is an issue of material fact concerning whether the Consent Decree is valid. In arriving at that conclusion, the majority relies on allegations made by the NCAA in its New Matter that relate to the NCAA's authority to impose the sanctions and the validity of the Consent Decree.[1] The paragraphs that contained those allegations were made by the NCAA in support of its defense that PSU was an indispensable party, that the Endowment Act was an unconstitutional impairment of contract, and some stray conclusions entitled "Additional Defenses." By cobbling those paragraphs together and examining the NCAA by-laws, the majority questions the validity of the Consent Decree stating that:

> The Consent Decree expressly recognizes the NCAA's questionable involvement in and its dubious authority pertaining to a criminal action against a non-university official which involved children who were non-university student-athletes. The Consent Decree recites that "[t]he sexual abuse of children on a university campus by a former university **official** ... while despicable, ordinarily would **not be actionable by the NCAA.**" Consent Decree at 4 (emphasis added).

*Corman v. Nat'l Collegiate Athletic Ass'n,* 93 A.3d 1, 16, 2014 WL 1382675, at *11 (Pa.Cmwlth.2014). Because contracting parties cannot ignore their own contractual covenants with impunity and still seek to

---

1. NCAA's September 24, 2013 Answer with New Matter to Plaintiffs' Second Amended Complaint, ¶¶ 96, 103–105, 137–140.

hold others to the contract, the majority then goes on to find that a determinative issue in this case is whether the Consent Decree is legal and whether the Consent Decree should be enforced at all. It also infers that because other students and coaches were affected, the Consent Decree may have denied procedural rights guaranteed by the NCAA bylaws and they may have an interest. Because this issue contained issues of disputed fact that could not be resolved without PSU, the majority, without notice, joins PSU as a party to this action.[2]

The majority appears to arrive at this outcome because it is bewildered, as I am, by how the Board of Trustees of PSU could have approved or allowed to be executed a "Consent Decree" involving the expenditure of $60 million of PSU funds when the Consent Decree specifically states that the matter "ordinarily would not be actionable by the NCAA." If, as the majority suggests, the NCAA did not have jurisdiction over conduct because it did not involve the regulation of athletics, then the expenditure of those funds is problematic, given that PSU is a non-profit corporation as well as being tax-exempt as a charitable organization, and that Boards of Directors of non-profit charitable corporations have a fiduciary duty to ensure that funds are only used for matters related to its charitable purpose—in this case, the students of PSU. *See* 15 Pa.C.S. § 5712. Moreover, the majority position is understandable given the lax supervision by those responsible for insuring that nonprofit and charitable organizations operate as non-profit and charitable organizations as well as

their failure to take action against Boards of Directors and Officers who use funds of a non-profit and/or charitable entity to pay funds that they are not legally obligated to pay and/or expend funds not related to their charitable purpose or who no longer act as a charity. *See Zampogna v. Law Enforcement Health Benefits, Inc.*, 81 A.3d 1043, 1047 (Pa.Cmwlth.2013).

Notwithstanding all of that, I disagree with the majority that this is a matter before us. None of the parties to this case have disputed that the contract—the Consent Decree—is valid; the only dispute is applicability of the Endowment Act to the expenditure of funds owed under that agreement. Essentially, the majority spontaneously came up with that new cause of action, inferred from paragraphs in various defenses pled by the NCAA that the Consent Decree is invalid and none of the sanctions could be enforced. Because we must only address the matters before us and the causes of action pled by Plaintiffs, I respectfully dissent from that portion of the majority opinion.

## II.

I also dissent from the majority's decision that the Endowment Act is not special legislation. I would hold that the Endowment Act creates a class that is substantially closed to future membership and, therefore, is *per se* unconstitutional.

Article III, Section 32 of the Pennsylvania Constitution provides, in relevant part, that "[t]he General Assembly shall pass no local or special law in any case which has been or can be provided for by general

---

**2.** I reiterate what I stated in my dissent in *Corman I* that PSU is an indispensable party and, as a result, we lack jurisdiction. A party is generally regarded to be indispensable "when his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights."

*City of Philadelphia v. Commonwealth*, 575 Pa. 542, 567, 838 A.2d 566, 581 (2003) (citation omitted). If the issue involved is whether the Consent Decree is valid, as a party to the consent decree, PSU's rights are so connected that no decree can be issued without affecting those rights.

law...." PA. CONST. art. III, § 32. Over the years, the underlying purpose of Article III, Section 32 has been recognized to be analogous to federal principles of equal protection under the law. *Pennsylvania Turnpike Commission v. Commonwealth*, 587 Pa. 347, 363, 899 A.2d 1085, 1094 (2006). The common constitutional principle at the heart of the special legislation proscription and the equal protection clause is that like persons in like circumstances should be treated similarly by the sovereign. *Id.*

As our Supreme Court has held, "legislation creating a class of one member that is closed **or substantially closed** to future membership is *per se* unconstitutional." *West Mifflin Area School District v. Zahorchak*, 607 Pa. 153, 163, 4 A.3d 1042, 1048 (2010) (emphasis added). *See also Harrisburg School District v. Hickok*, 563 Pa. 391, 398, 761 A.2d 1132, 1136 (2000) ("a classification is *per se* unconstitutional when the class consists of one member and it is impossible **or highly unlikely** that another can join the class.") (Emphasis added).

The Endowment Act only applies if the following conditions are met: (1) there is an agreement; (2) between an institution of higher education; and (3) a governing body; (4) for a monetary penalty; (5) that is at least $10,000,000; (6) that is payable in installments; (7) over more than one year; and (8) the agreement states that the penalty can only be used for programs in Pennsylvania regarding child abuse and advocacy. The majority, relying on *Hickok*, holds that although it is unknown if those conditions will ever be met in the future, the fact that these circumstances could theoretically occur precludes a finding that the Endowment Act is *per se* unconstitutional.

I disagree with the majority for two reasons. First, from the facts, it is obvious that this is special legislation because of the pleadings in this case and public comments by the sponsor of the bill that it insures that the $60 million fine imposed under the Consent Decree for matters addressing child abuse can only be spent in Pennsylvania. Second, the majority ignores that the Endowment Act provisions track provision by provision the Consent Decree imposing the fine, which, itself, makes it "highly unlikely" that the Endowment Act will ever apply to an agreement other than the Consent Decree between the NCAA and PSU. Given the Act's extremely specific conditions, it is beyond dispute that a "highly improbable convergence of events would be necessary" for the Act to apply to any subsequent agreement. *See West Mifflin School District*, 607 Pa. at 163, 4 A.3d at 1048. Therefore, the class created by the Endowment Act is, at a minimum, substantially closed to new members and is *per se* unconstitutional.

Accordingly, for the foregoing reasons, I respectfully dissent.