# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joseph B. Scarnati, Senator and President pro tempore of the Senate of Pennsylvania; Jake Corman, Senator and Majority Leader of the Senate of Pennsylvania; Jay Costa, Senator and Minority Leader of the Senate of Pennsylvania,

      Petitioners

     v.

Tom Wolf, Governor of Pennsylvania; Randy Albright, Secretary of the Budget; Christopher Craig, Acting State Treasurer of Pennsylvania; Dennis M. Davin, Acting Secretary of Community and Economic Development; Cindy Adams Dunn, Acting Secretary of Conservation and Natural Resources; John Quigley, Acting Secretary of Environmental Protection; Curtis M. Topper, Acting Secretary of General Services; Kathy Manderino, Acting Secretary of Labor & Industry; James R. Joseph, Acting Adjutant General of Pennsylvania; Josh Shapiro, Chairman of the Pennsylvania Commission on Crime and Delinquency,

      Respondents

:
:
:
:
:
:
:
:
:
:
:
:
:  No. 579 M.D. 2014
:  Argued: June 17, 2015
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

BEFORE:  **HONORABLE DAN PELLEGRINI,** President Judge
     **HONORABLE BERNARD L. McGINLEY,** Judge
     **HONORABLE BONNIE BRIGANCE LEADBETTER,** Judge
     **HONORABLE RENÉE COHN JUBELIRER,** Judge
     **HONORABLE PATRICIA A. McCULLOUGH,** Judge

**OPINION BY**
**JUDGE LEADBETTER**                    **FILED:  December 30, 2015**

In the underlying petition for review (PFR) seeking declaratory and injunctive relief, the Senator Petitioners (Senators) challenge as unconstitutional former Governor Thomas Corbett's partial disapproval of the General Appropriations Act of 2014 (GAA) and 2014 Fiscal Code Amendments (FCA).[1] Presently before the court are Respondents' preliminary objections seeking dismissal of the PFR for lack of standing, and Senators' application for partial summary relief seeking judgment in their favor regarding Counts I and II of their PFR (asserting that the line-item vetoes of both bills were unconstitutional).  After review, we deny these requests for relief.

The dispositive facts are largely undisputed.[2]  Both the GAA (also referred to as HB 2328) and FCA (also referred to as HB 278) originated in the

---

[1] Because this action was commenced before the November 2014 election, the petitioners originally included Senators Joseph B. Scarnati, President *pro tempore* of the Pennsylvania Senate, Dominic F. Pileggi, Majority Leader of the Pennsylvania Senate, and Jay Costa, Minority Leader of the Pennsylvania Senate.  Original Respondents included former Governor Corbett, Charles Zogby, Secretary of the Budget, Robert M. McCord, State Treasurer, and the Secretaries of various state agencies. *See* PFR, filed November 4, 2014.  The representative parties have been changed where appropriate to reflect the new 2015 administration and Senate leadership. *See* Pa. R.A.P. 502(c); *see also Rendell v. Pa. State Ethics Comm'n*, 983 A.2d 708, 710 n.2 (Pa. 2009).

The GAA that Governor Corbett signed is Act No. 2014-1A [House Bill (HB) 2328, Printer's Number (PN) 3895]; the FCA that the Governor signed is Act No. 2014-126 (HB 278, PN 3930). The Governor's action in disapproving certain provisions in each Bill is otherwise known as a "line-item veto."

[2] We preliminarily note that while the majority of the facts recited are taken from the averments set forth in the PFR, others reflect factual assertions set forth by the parties in the various papers filed in connection with the matters before the court.  Typically, in deciding preliminary objections, we are limited to considering only the facts set forth in the PFR as well as all inferences reasonably deducible therefrom. *See generally Corman v. Nat'l Collegiate*
**(Footnote continued on next page…)**

Pennsylvania House of Representatives (House). On July 1, 2014, HB 2328 was presented to the Governor for his consideration. Similarly, on July 9, 2014, HB 278 was presented to the Governor for his consideration. On that same date, the House adjourned.[3]

On July 10, the Governor approved in part and disapproved in part HB 2328 and HB 278.[4] Notably, regarding HB 2328, the Governor's disapprovals reduced the amount appropriated to the Senate for various expenses, such as: salaries, wages and other personnel expenses of Senate employees and expenses of the office of the President *pro tempore*, which were to be disbursed at the direction of the President *pro tempore*; the amount allocated to each Senate member for actual expenses incurred for lodging, meals and other incidentals while away from home on official business, legislative purchasing of such items as furniture,

_____

**(continued…)**

*Athletic Ass'n*, 74 A.3d 1149, 1156 (Pa. Cmwlth. 2013), *reargument denied*, 93 A.3d 1 (Pa. Cmwlth. 2014). In resolving an application for summary relief, we are limited to considering the undisputed facts, which may be drawn from, inter alia, pleadings, depositions, answers to interrogatories and admissions. *See generally The Summit Sch., Inc. v. Comm., Dep't of Educ.*, 108 A.3d 192, 195-96 (Pa. Cmwlth. 2015). Because the facts relied upon in resolving the issues before the Court are seemingly undisputed, including those asserted only in the context of a brief (and in many instances may be confirmed with the exercise of judicial notice), in the interest of judicial economy, we will proceed to resolve the legal issues presented without requiring the parties to amend the PFR or engage in further needless procedural filings.

[3] According to the Legislative Journal for the House on that date, the Speaker adjourned the House until Monday, August 4, 2014, unless recalled sooner. Pa. Legislative Journal – House (July 9, 2014) at 1234. The House's Journal further reflects that the House reconvened on July 29, 2014. *Id.* (July 29, 2014) at 1235. The Senate's Journal indicates that it recessed on July 8, 2014, until September 14, unless recalled sooner. Pa. Legislative Journal – Senate (July 8, 2014) at 2124. The Senate apparently reconvened on September 15 as originally planned. *Id.* (September 15, 2014) at 2125.

[4] With respect to HB 2328, the Governor disapproved of one appropriated item in its entirety and reduced the amount of the appropriation for numerous other appropriated items. *See* PFR, Appendix Tab A. The Governor completely disapproved of a number of provisions in HB 278. *Id.*, Appendix Tab B.

technology improvements, security enhancements and equipment; and the amount available for the Caucus operations account.   With respect to HB 278, the Governor completely disapproved the following item:

> Section 1724-J. Department of General Services.
>
> From funds appropriated for rental, relocation and municipal charges, $2,500,000 shall be transferred to the Senate for distribution upon approval of the President pro tempore of the Senate and Majority Leader of the Senate and $2,500,000 shall be transferred to the House of Representatives for distribution upon approval of the Speaker of the House of Representatives and the Majority Leader of the House of Representatives.

PFR, Appendix Tab B at 90-91(Section 1724-J).   In two separate written messages to the House, the Governor detailed his specific disapprovals/objections to each bill.  *See* PFR, Appendix Tabs C and D.  The bills and objections were returned to the House Parliamentarian.[5]  In addition, as Senators aver, by letters dated July 10 to the Secretary of the Commonwealth (Secretary), the Governor

> delivered the signed originals of HB [278 and HB 2328], together with copies of them, to the Secretary.  He asked the Secretary to assign act numbers to the bills, retain the copies, and return the original bills, through the Office of General Counsel, to the House, the body in which the bills originated.  He asked that the Secretary request the Senate and House to return the originals of the bills to the

---

[5] *See* Affidavit of Nicole Bordonaro, Executive Deputy General Counsel for Legislation in the Office of General Counsel,  attached to Respondents' Brief in Opposition to Application for Partial Summary Relief.   According to Ms. Bordonaro: "The delivery to the House Parliamentarian on July 10, 2014, of HB 278 and HB 2328, along with the veto messages from the Governor, is consistent with the established procedure for the return to the House by the Governor of bills that he has vetoed [pursuant to state constitutional authority]." Affidavit at ¶ 10, Exhibit 1 to Respondents' Brief.

3

Department of State for filing and permanent retention, "upon the completion of the General Assembly's reconsideration of the line item appropriations that I have disapproved."

*Id.*, ¶ 27. *See also* PFR, Appendix Tabs E and F. In addition, on that same day, July 10, the Governor's Office of the Budget issued a press release, which announced that the Governor had signed the GAA and FCA; the press release also generally detailed the various line item vetoes in each bill, noting the agency, provision or program and the amount involved.[6] *See* Exhibit 2 to Respondents' Brief in Opposition to Application for Partial Summary Relief. The Governor's press release was not published in the Pennsylvania Bulletin (Bulletin). Finally, the House did not engage in further consideration of the disapproved items as is constitutionally permitted (see discussion below) and the General Assembly adjourned *sine die* on November 12, 2014.[7]

Senators filed this action on November 4, 2014, challenging the propriety and effectiveness of the line-item vetoes. Specifically, in Count I, they contend that because the adjournment of the House prevented the Governor's return of the disapproved bills to the House, the Governor was constitutionally required to give notice of his actions by public proclamation, which he failed to do, thereby rendering his specific vetoes invalid. In Count II, Senators contend that inasmuch as HB 278, the FCA, does not constitute a general appropriation bill, the Governor was not constitutionally permitted to disapprove only select provisions of that legislation. According to Senators, pursuant to constitutional restriction, the

---

[6] Respondents note in their Brief in Opposition to Application for Partial Summary Relief that the "press release was made publically available on the Commonwealth's website." Brief at 23.

[7] An adjournment *sine die* "end[s] a deliberative assembly's or court's session without setting a time to reconvene." Black's Law Dictionary 44 (8th ed. 2004).

Governor was limited to either approving or disapproving the FCA in its entirety, thereby rendering his select vetoes invalid.[8]

As noted above, Respondents have challenged Senators' standing to bring this action, and Senators, contending that the vetoes failed to comply with constitutional requirements, maintain that they are entitled to judgment as a matter of law. In addition to the issue of legislative standing, we are called upon to examine the constitutional requirements for the veto-return process when the General Assembly has adjourned, including the manner in which the Governor may satisfy the requirement for notice by "public proclamation," and whether the Governor's authority to partially disapprove of (i.e., line-item veto) a general appropriation bill extends to the subsequent, closely-related and dependent, comprehensive legislation generally known as the Fiscal Code Amendments, here, Act No. 2014-126 (HB 278).

Prior to addressing the parties' separate requests for relief, it is helpful to set forth the primary state constitutional provisions at the center of this dispute. To begin, a general appropriation bill is one of the few exceptions to the oft-discussed single-subject rule. Article III, Section 3 of the Pennsylvania Constitution states: "No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying the law or a part thereof." PA. CONST. art. III, § 3. Because of the legislative mischief that could result if this exception for a general appropriation

---

[8] While not challenged in the application for partial summary relief, we note that in Count III of the PFR, Senators contend that the Governor's unconstitutional actions have resulted in an unauthorized budgetary reserve. Accordingly, Senators request, inter alia, that Respondents be enjoined "from complying with the Governor's disapprovals of provisions in the General Appropriation Act of 2014 and Fiscal Code Amendments and from complying with the 'budgetary reserve.'" PFR at 20 ["WHEREFORE" clause, subparagraph (d)].

5

bill were not limited, the Constitution restricts the scope of a general appropriation bill as follows: "The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject." PA. CONST. art. III, § 11.

While the legislative power is vested in our General Assembly, *see* Article II, Section 1 of our Constitution, it is well established that the Governor's veto power is a form of limited legislative authority. *Jubelirer v. Rendell*, 953 A.2d 515, 529 (Pa. 2008) (stating: "The Governor's exercise of his veto power is unique in that it is essentially a limited legislative power, particularly in the appropriations context."). The Governor's veto power is set forth in Article IV, Sections 15 and 16 of the Pennsylvania Constitution. Article IV, Section 15 provides:

> Every bill which shall have passed both Houses shall be presented to the Governor; if he approves he shall sign it, but if he shall not approve he shall return it with his objections to the House in which it shall have originated, which House shall enter the objections at large upon their journal, and proceed to re-consider it. If after such reconsideration, two-thirds of all the members elected to that House shall agree to pass the bill, it shall be sent with the objections to the other House by which likewise it shall be re-considered, and if approved by two-thirds of all the members elected to that House it shall be a law; but in such cases the votes of both Houses shall be determined by yeas and nays, and the names of the members voting for and against the bill shall be entered on the journals of each House, respectively. If any bill shall not be returned by the Governor within ten days after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless

6

the General Assembly, by their adjournment, prevent its return, in which case it shall be a law, unless he shall file the same, with his objections, in the office of the Secretary of the Commonwealth, and give notice thereof by public proclamation within thirty days after such adjournment.

PA. CONST. art. IV, § 15.  Section 16 provides in turn:

The Governor shall have power to disapprove of any item or items of any bill, making appropriations of money, embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void, unless re-passed according to the rules and limitations prescribed for the passage of other bills over the Executive veto.

PA. CONST. art. IV, § 16.  Finally, Article III, Section 24 provides that:

No money shall be paid out of the treasury, except on appropriations made by law and on warrant issued by the proper officers; but cash refunds of taxes, licenses, fees and other charges paid or collected, but not legally due, may be paid, as provided by law, without appropriation from the fund into which they were paid on warrant of the proper officer.

PA. CONST. art. III, § 24.

Turning to the issue of Senators' standing to bring this action, Respondents first contend in their preliminary objections that Senators have failed to aver sufficient harm to their interests as legislators to confer legislative standing in this matter.  In Pennsylvania, standing is "prudential in nature," and as a preliminary threshold, a party must first establish his or her right to maintain the action.  *Fumo v. City of Philadelphia*, 972 A.2d 487, 496 (Pa. 2009).  If a party is not sufficiently aggrieved by the challenged action, he or she lacks standing to seek a judicial resolution of the challenge.  *Id.*

7

> An individual can demonstrate that he has been aggrieved if he can establish that he has a substantial, direct and immediate interest in the outcome of the litigation. A party has a substantial interest in the outcome of litigation if his interest surpasses that of all citizens in procuring obedience to the law. The interest is direct if there is a causal connection between the asserted violation and the harm complained of; it is immediate if that causal connection is not remote or speculative.

*Id.* (citations and quotations omitted).

In their PFR, Senators note that their interest in this action stems from, inter alia: (1) Senator Pileggi's (now Senator Corman's) responsibility as Majority leader "for ensuring that the Senate's consideration of legislation is carried out in accordance with the Constitution and that, likewise, the enactment of legislation – insofar as it relates to the Senate and its powers, duties, and responsibilities – is carried out in accordance with the Constitution." PFR, ¶ 51; and (2) their interest in the Senate's final vote for adoption of the GAA and FCA bills at issue.[9] In addition, while not asserted in the PFR, Senators also point out in their brief in response to the preliminary objections that the Governor's vetoes reduced and eliminated funding for leadership accounts that they exclusively control, thereby directly impacting a matter of responsibility and concern uniquely personal to them as parties. They further contend in their responsive brief that an unconstitutional veto serves to essentially nullify otherwise valid legislative votes.

---

[9] While not sufficient to establish legislative standing, Senators also allege the following interests: (1) their individual oaths of office to "support, obey and defend . . . the Constitution of this Commonwealth" PFR, ¶ 49 (quoting PA. CONST. art. VI, § 3); (2) Senator Scarnati's responsibility, as President *pro tempore,* for presiding over the Senate and, in the absence of the President of the Senate, signing all bills passed by the General Assembly; (3) the present uncertainty regarding whether the Governor's disapprovals of provisions in the GAA and FCA are effective and whether the budgetary reserve is effective despite enacted appropriations; and (4) their interest in having money paid out of the State Treasury in accordance with the law.

Both this court and our Supreme Court have undertaken a thorough examination of legislative standing on several occasions; these discussions provide helpful guidance here. In the first case, *Wilt v. Beal*, 363 A.2d 876 (Pa. Cmwlth. 1976), often described as the seminal case on legislative standing, William Wilt, a former member of our state House of Representatives, sought to enjoin the Commonwealth's Secretary of Public Welfare and Treasurer from moving forward with administrative plans to use and operate a completed facility as a mental health care facility. Wilt apparently averred in his petition that the purpose of the bill for which he had voted was frustrated by these plans, thereby depriving him of the effectiveness of his vote. This court examined state and federal cases addressing the nature of both taxpayer and legislative standing and summarized its conclusions as follows:

> What emerges from this review . . . is the principle that legislators, as legislators, are granted standing to challenge executive actions when specific powers unique to their functions under the Constitution are diminished or interfered with. Once, however, votes which they are entitled to make have been cast and duly counted, their interest as legislators ceases. Some other nexus must then be found to challenge the allegedly unlawful action. We find this distinction to be sound for it is clear that certain additional duties are placed upon members of the legislative branch which find no counterpart in the duties placed upon the citizens the legislators represent. These duties have their origin in the Constitution and in that sense create constitutional powers to enforce those duties. Such powers are in addition to what we normally speak of as the constitutional rights enjoyed by all citizens. To give but one familiar example, under the Pennsylvania Constitution, members of the Senate have the duty to approve or disapprove certain appointments made by the Governor. Interference with the performance of this duty would be an injury to members of the Senate sufficient to give each senator standing to

9

protect the injury to his or her 'constitutional right' to vote for or against confirmation of an executive appointee.

*Id.* at 881 (footnotes omitted). Based upon these principles, this court concluded that Wilt lacked standing as a legislator to pursue his action, stating:

[O]nce Wilt's vote had been duly counted and the bill signed into law, his connection with the transaction as a legislator was at an end. Therefore, he retains no personal stake, as required by *William Penn [Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269 (Pa. 1975)] in the outcome of his vote which is different from the stake each citizen has in seeing the law observed.

*Id.* (emphasis omitted).

Years later, in *Fumo*, 972 A.2d 487, our Supreme Court considered legislative standing and the nature of the interest required for capacity to sue. There, various members of both houses of our General Assembly sought review of a local agency decision [City of Philadelphia Department of Commerce (Department)] authorizing the issuance of a license to construct a casino upon submerged lands in the Delaware River. The petitioners contended on appeal that the General Assembly had the sole authority to convey or license the use of the submerged lands at the location at issue. In support of their standing to sue, the petitioners alleged, inter alia, that they were aggrieved by the Department's action because it "substantially conflict[ed] with their exclusive authority to prescribe the terms and conditions by which submerged lands abutting their legislative districts should be conveyed for private development." *Id.* at 496. The Court summarized the principles pertaining to legislative standing as follows:

Legislators and council members have been permitted to bring actions based upon their special status where there

10

was a discernible and palpable infringement on their authority as legislators. The standing of a legislator [ ] to bring a legal challenge has been recognized in limited instances in order to permit the legislator to seek redress for any injury the legislator [ ] claims to have suffered in his official capacity . . . . Legislative standing has been recognized in the context of actions brought to protect a legislator's right to vote on legislation or a councilmember's viable authority to approve municipal action. Legislative standing also has been recognized in actions alleging a diminution or deprivation of the legislator's or council member's power or authority. At the same time, however, legislative standing has not been recognized in actions seeking redress for a general grievance about the correctness of governmental conduct.

*Id.* at 501. The Court concluded that the petitioners' allegations of an alleged usurpation of their authority as members of the General Assembly and denial of their ability to vote and otherwise consider the licensing at issue set forth claims that the legislators had standing to pursue. *Id.* at 502. On the other hand, regarding the petitioners' claim that the Department abused its discretion in granting the license, the Court found a lack of standing, noting that a legislator has no legal interest in "seeking redress for a general grievance about the correctness of governmental conduct," and that their claim did not demonstrate any interference with or diminution in their authority as legislators. *Id.* at 501-02. *See also Corman v. National Collegiate Athletic Ass'n*, 74 A.3d 1149 (Pa. Cmwlth. 2013), *reargument denied*, 93 A.3d 1 (Pa. Cmwlth. 2014).

Finally, in *Zemprelli v. Daniels*, 436 A.2d 1165 (Pa. 1981), five state senators who voted against the confirmation of a nominee to the State Tax Equalization Board filed a petition for review in the nature of *quo warranto* seeking to remove the confirmed nominee. In their petition, the senators challenged the determination that the nomination had been confirmed by majority

11

vote of the senate, contending that the Senate President had improperly computed the vote based on the number of senators currently in office (48), rather than elected to office (50), thereby diluting their votes and their effectiveness as legislators. Assuming that this logic could be correct, we agreed that it posed a possible cognizable injury to the senators in their legislative capacity. In doing so, we rejected the argument that once the senators had the opportunity to vote on the nomination, their special interest in the matter ceased, noting that such argument might be appropriate were the voting process itself not at issue. *Id.* at 1167.

Here, we conclude that Senators have alleged a sufficient legislative interest to demonstrate their standing to pursue this action. Unlike in *Wilt*, and even *Fumo* to a limited extent, Senators are not challenging whether subsequent governmental action conformed to established law, but whether the Governor, in carrying out his corresponding duties in the joint legislative process, satisfied constitutional requirements. To the extent the Governor's actions are not constitutionally compliant, the proper legislative process as a whole, and the General Assembly's role in that process, might have been thwarted, resulting in an improper nullification of their votes for the bills at issue and a diminution of their role in the enactment process. As in *Zemprelli*, a process involving the legislature is directly at issue.

Moreover, there can be no dispute that an unconstitutional veto of appropriated sums under Senators' control, which impacts the manner in which their official business is conducted, provides an interest that surpasses that of the general public in requiring that "the Government be administered according to the law." *Fumo*, 972 A.2d at 500 [discussing and quoting *Common Cause of Pa. v. Commonwealth*, 558 F.3d 249, 259 (3d Cir. 2009) (internal quotation omitted)].

12

Rather, such action directly interferes with their legislative authority, duties and interests. With respect to the latter conclusion, we reject Respondents' contention that, "the appropriations at issue are made to the Senate, not to individual Senators; and so any right of action belongs to the Senate as a body, not to the Senators." Respondents' Reply Brief in Support of Preliminary Objections at 2. Respondents have not cited to any authority to support this proposition and our own research has not produced supportive authority. Indeed, the cases discussed above support a contrary conclusion; individual legislators have standing to pursue matters that affect their interests as members of the General Assembly. Accordingly, the Respondents' preliminary objections are denied.[10]

Turning to the application for partial summary relief,[11] Senators, focusing on the procedure for a veto-return under Article IV, Section 15, first contend that because the House had adjourned on July 9, 2014, the Governor was prevented from returning the bills to the House, where they had originated, and was instead required to file his objections with the Secretary of the Commonwealth and give notice thereof by public proclamation within thirty days of the House's adjournment.[12] Senators maintain that a temporary adjournment precludes the

---

[10] Because we conclude that legislative standing has been established, it is not necessary to consider whether Senators can bring this action in some other capacity.

[11] Pursuant to Rule of Appellate Procedure 1532(b): "At any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Pa. R.A.P. 1532(b). Summary relief is appropriate where no material issues of fact are in dispute and the moving party's right to judgment is clear. *Jubelirer v. Rendell*, 953 A.2d 515, 521 (Pa. 2008).

[12] Article IV, Section 15 provides in this regard:

> If any bill shall not be returned by the Governor within ten days
> after it shall have been presented to him, the same shall be a law in
> like manner as if he had signed it, unless the *General Assembly, by
> their adjournment*, prevent its return, in which case it shall be a

**(Footnote continued on next page…)**

13

effective return of the bill with objections; they support their position with decisional authority from other jurisdictions considering the meaning of the term "adjournment" as it appears in different constitutional provisions providing for an executive's return of a bill with objections.[13] These cases not only examine the type of adjournment which prevents the return of a bill (*e.g.*, temporary vs. final or *sine die*) but also consider when service of the return on a clerk or other legislative officer is acceptable to effectuate a veto-return. *See, e.g.*, *Okanogan Indian Tribe v. United States*, 279 U.S. 655 (1929). According to Senators, because the Governor failed to give notice of his return by public proclamation, each bill in its entirety became law. Specifically, Senators note that the Governor failed to give notice of his actions in the Bulletin as is required by Sections 724 and 725 of Title 45 of the Consolidated Statutes, 45 Pa. C.S. §§ 724, 725 (requiring all proclamations and executive orders of the Governor to be published in the Bulletin).[14]

Respondents contend on the other hand, that the House's temporary adjournment during its session did not *prevent the Governor from returning the vetoed bills*. They note that Article II, Section 4 of our Constitution states: "The

---

**(continued…)**
> law, unless he shall file the same, with his objections, in the office of the Secretary of the Commonwealth, and give notice thereof by public proclamation within thirty days after such adjournment. [Emphasis added].

[13] The provisions included in the survey varied in language.

[14] Section 19.363 of Title 101 of the Pennsylvania Code, 101 Pa. Code § 19.363 (titled "Proclamation of vetoes subsequent to adjournment"), applicable to the Legislative Reference Bureau and part of the Legislative Drafting Manual, sets forth a form or format for a proclamation announcing a gubernatorial veto of a bill. The form sets forth a document titled, "PROCLAMATION," and as written, indicates that it is authored "under the [Governor's] hand and 'Great Seal . . . .'" *Id.*

14

General Assembly shall be a continuing body during the term for which its Representatives are elected." PA. CONST. art. II, § 4. In support of their position that a temporary adjournment by the House does not prevent the return of a bill with objections, Respondents also undertake an analysis of judicial opinions from various jurisdictions considering the meaning of the term "adjournment" in a similar constitutional context. According to Respondents, the majority of jurisdictions considering the issue have concluded that a temporary adjournment of short duration does not preclude an executive from returning a bill to the originating body with notice of his or her veto. Respondents also maintain that this court's en banc decision in *Jubelirer v. Pennsylvania Department of State*, 859 A.2d 874 (Pa. Cmwlth. 2004), *aff'd*, 871 A.2d 789 (Pa. 2005), supports this view.

Respondents also posit that the Governor's return of the subject bills was consistent with accepted past practice: "In Pennsylvania, the long-standing practice of the Governor has been to return bills through an agent and to return them not to the House or Senate in open session, but to the Parliamentarian or Clerk of the house in which the bill had originated. (Bordonaro Aff. ¶ 10)." Respondents' Brief in Opposition to Application for Partial Summary Relief at 20.[15] According to Respondents, a representative of the Governor delivered the

---

[15] Respondents maintain that, to the extent that Senators dispute that this is the accepted practice by both houses, a material issue of fact exists, precluding summary relief.

Regarding the House parliamentarian, Section 1 of the Act of May 28, 1931, P.L. 200, provides:

> The Speaker of the House of Representatives shall, at the commencement of each Session of the General Assembly, appoint a parliamentarian to advise the Speaker on parliamentary questions and legislative procedure, and to perform such other duties in connection with the house desk and house transcribing room as the Speaker and Chief Clerk of the house shall direct. . . . Between legislative sessions, the parliamentarian shall perform such duties

**(Footnote continued on next page…)**

15

two bills, together with the Governor's objections, to the House Parliamentarian; the "Parliamentarian's office was open for business during the intra-session adjournment of the House that had begun one day earlier and that would conclude 19 days later; the House's temporary, three-week adjournment did not prevent the Governor's agent from returning the bills to the Parliamentarian as agent for the House." *Id.* at 20-21.

Finally, notwithstanding the above arguments, Respondents contend that if public notice was required, the Governor's press release and the subsequent notice of his veto in the Bulletin satisfied the requirements of Article IV, Section 15.[16]   Respondents maintain that other than mandating notice by public proclamation, the Constitution does not specify the form or substance of the notice. Noting the accepted legal definition of "proclamation," "a formal public announcement that is made by the government or a government official," *id.* at 23 (citation omitted) and, that, the purpose of the proclamation is to provide the public with knowledge regarding the status of pending legislation, Respondents argue that the press release satisfied the constitutional requirement for public notice – it was a

---

**(continued…)**

> for the Speaker, any committee of the house, or any legislative
> commission, as the Speaker of the house shall prescribe.

46 P.S. § 36.

[16] In addition to the press release, Respondents have attached to their brief as Exhibit 3 photocopies of the Bulletin from Saturday, August 2, 2014, 44 Pa. B. 5176 (titled, "THE GENERAL ASSEMBLY [-] Recent Actions during the 2014 Regular Session of the General Assembly"). This publication contains a list noting recent legislative action by the General Assembly. The list is in column format and details, inter alia, the date of action, bill number, effective date and subject matter, including the following items: (1) "Jul 10  10 HB0278  . . . Immediately [with exceptions]  Fiscal Code—omnibus amendments-line item veto;" and (2) "Jul 10 HB2328 . . . Immediately  General Appropriation Act of 2014—enactment—line item veto." *Id.*

16

formal public announcement that detailed the Governor's actions regarding the two bills at issue.

The various decisions cited by the parties demonstrate that there is clearly a split of authority among the different jurisdictions regarding whether a temporary adjournment by both houses of the legislature prevents the return of a vetoed bill to the house where the bill originated. While our decision in *Jubelirer* would appear to settle the legal issue of the nature of adjournment, unresolved issues of fact preclude the Court from determining whether a Constitutionally-required adjournment occurred so as to prevent the Governor from returning his objections to the House.

As we noted in *Jubelirer*, "the fundamental rule of construction which guides us [in interpreting our Constitution is that the language] controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." 859 A.2d at 876 (quotations and citation omitted). Moreover, the general rules of statutory construction aid our interpretation of constitutional provisions. *Id.* It is important to note that the Article IV, Section 15 adjournment, which will preclude the return of a bill with objections, is the adjournment of the *General Assembly*, not the adjournment of the *house* where the bill originated. *See* PA. CONST. art. II, § 1 ("The legislative power of this Commonwealth shall be vested in a *General Assembly*, which shall consist of a Senate and a House of Representatives.") (Emphasis added). The precise use of the term "General Assembly" in Article IV, Section 15 cannot be ignored and must be given effect when construing the provision. *See* Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1921(a) (stating rule of statutory construction that every statute "shall be construed, if possible, to give effect to all its provisions"), and (b)

17

(stating rule of statutory construction that, "[w]hen the words of the statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."). *See also Wright v. United States*, 302 U.S. 583, 587-88 (1938) (discussing federal constitutional provision providing for presidential return of bill with objections and noting that the word "Congress" is not used to describe a single House). If the adjournment of only the house where the bill originated was sufficient to prevent the Governor from effectuating a return of the bill, there would have been no need to use the term "General Assembly" in setting forth the procedure to effectuate a valid return; to construe the provision differently renders the reference to the General Assembly completely meaningless.[17]

As noted, the General Assembly is a continuing body during the term for which its representatives are elected. The term begins on "December 1 of each even-numbered year and ends at the expiration of November 30 of the next even-numbered year." 101 Pa. Code § 7.21(a). Pursuant to Article II, Section 14: "Neither House shall, without the consent of the other, adjourn for more than three days, nor to any other place than that in which the two Houses shall be sitting." PA. CONST. art. II, § 14. An adjournment for more than three days "is accomplished by the adoption of a concurrent resolution.[18] Where the time for reconvening is

---

[17] This point bears noting because both parties focus on the import of the temporary adjournment of the House, not the General Assembly.

[18] While the legislative journal for each chamber reflects that both houses were adjourned for a period of time exceeding three days, it is not clear whether such was consensual and by concurrent resolution. *See* PA. CONST. art. II, § 14; 101 Pa. Code § 7.24(a). As our Supreme Court noted in *Frame v. Sutherland*, 327 A.2d 623, 626 (Pa. 1974), the constitutional scheme is "predicated on the assumption that adjournment may not be a unilateral act on the part of one of the houses of the General Assembly." The exception to the consent requirement for adjournments lasting less than four days provides flexibility in the legislative calendar and **(Footnote continued on next page…)**

18

subsequent to the beginning of the following week, the adjournment is generally referred to as a recess and sometimes made subject to reconvening at an earlier date at the call of the presiding officer of each house." 101 Pa. Code § 7.24(a) (footnote added).[19] "When the General Assembly finally adjourns any regular or special session, such adjournment is referred to as an adjournment [*sine die*] and is accomplished by a concurrent resolution." *Id.*, § 7.24(b). All matters which are pending before the General Assembly upon its adjournment *sine die* or on expiration of its first regular session maintain their status and are pending before the General Assembly in its second regular session. *Id.*, § 7.21(b).

In *Jubelirer*, 859 A.2d 874, this court addressed whether the Governor properly vetoed a bill following the General Assembly's adjournment over the Christmas and New Year holidays. There, our recitation of the facts indicated that the House Bill was presented to the Governor on December 22 and that the General Assembly adjourned on December 23, intending to reconvene on January 6 of the following year. On December 31, the Governor attempted to return the bill with his objections to the House but its offices were closed. The Governor then filed the bill and his objections with the Secretary and notice of his veto was published in the Pennsylvania Bulletin. We summarized the veto-return procedure as follows:

---

**(continued…)**

"reflects the perception that adjournments of less than four days present a minimal threat to each house's interest in the consideration by the other of its bills." *Id.* at 627.

[19] In general, the Senate convenes its weekly sessions on Monday; if a motion to adjourn does not contain a reconvening time, the Senate reconvenes the next day at 10:00 a.m. 101 Pa. Code § 7.23(a). "The House convenes on the first legislative day of the week at 1 p.m. and on other days at the discretion of the House, and adjourns not latter [sic] than 11 p.m., unless otherwise ordered by a majority of members elected to the House." *Id.*, § 7.23(b).

Construing the language of Article IV, Section 15 in its popular sense, we find the language to be clear and unambiguous. If the Governor disapproves a bill passed by the General Assembly, the Governor has ten days to return the bill to the originating chamber with his objections. *However, if the General Assembly has adjourned and the adjournment prevents the Governor from returning the bill within ten days*, then the Governor may effectuate a veto by filing the bill and objections with the office of the Secretary of the Commonwealth and by giving public notice within thirty days of the adjournment.

859 A.2d at 876 (emphasis added). We then concluded that the Governor's veto of the bill at issue was effective, rejecting the argument that only a final adjournment would preclude the Governor's return of a bill with objections. We stated:

We reject the argument that the word "adjourn" in Article IV, Section 15 is ambiguous and susceptible of more than one reasonable meaning. . . . [Senators] argue that the word "adjourn" in Article IV, Section 15 could reasonably refer only to an adjournment *sine die*, which is final adjournment by both chambers of the General Assembly without stating a date of return. However, we cannot conclude that the popular sense of the unmodified word "adjourn" in Article IV, Section 15 is a special type of adjournment known by the Latin designation *sine die*. Indeed, the framers knew the distinction between an ordinary adjournment and an adjournment *sine die* and used the Latin designation when they meant a final adjournment. *See* Pa. Constit. art. IV, § 8(b) (relating to nominations for vacancies made by Governor after an adjournment *sine die*).

859 A.2d at 877 n.2.

Thus, while *Jubelirer* commands the conclusion that a temporary, mid-session adjournment of the *General Assembly* can prevent the return of a bill with objections to the house where the bill originated, whether the General

20

Assembly had adjourned when former Governor Corbett returned his objections cannot be determined on this record.[20] As noted above, while both houses had adjourned for more than three days, the Legislative Journals fail to reflect whether such was done with the consent of the other house or by joint resolution. Accordingly, at this stage of the proceedings, we cannot hold as a matter of law that an adjournment by the General Assembly required the Governor to give notice of his actions by public proclamation.[21]

Assuming *arguendo* that notice by public proclamation was required, we turn to the issue of whether the Governor's press release was sufficient to satisfy the constitutional requirement. In resolving the question, we are guided by two basic principles. First, when called upon to judge the constitutionality of executive acts, we apply the same judicial restraint and presumptions that are employed when facing a constitutional challenge to legislative acts: the acts of the Governor, in whom the supreme executive power is vested, *see* Article IV, Section 1 of the Pennsylvania Constitution, are presumed to be constitutional unless they are clearly shown to be otherwise. *Stroup v. Kapleau*, 313 A.2d 237, 240 (Pa. 1973). Second, it is the role of the judiciary to interpret the Constitution and we are not bound "to the legislative judgment concerning the proper interpretation of constitutional terms." *Mesivtah Eitz Chaim of Bobov, Inc. v. Pike County Bd. of*

---

[20] Senators maintain that *Jubelirer* did not decide the issue here, that is, "can a bill be returned to an adjourned house at all?" Senators' Reply Brief at 3. The issue of whether the alleged long standing practice of returning bills to the Parliamentarian suggests that adjournment precludes return of the vetoed bill only when the office of the Parliamentarian is closed implicates facts averred but not of record and so we will not address it. We note that the issue does not appear to have been raised in *Jubelirer.*

[21] Indeed, where the *General Assembly* has not adjourned but the house where a bill originated has adjourned for three days or less, we discern no constitutional bar to returning the bill to an agent of the chambers during the temporary, unilateral adjournment.

21

*Assessment Appeals*, 44 A.3d 3, 7 (Pa. 2012) (internal quotation and citation omitted).  The General Assembly cannot alter the Constitution by "'purporting to define its terms in a manner inconsistent with judicial construction; interpretation of the Constitution is the province of the courts.'" *Id.* [quoting *Pottstown Sch. Dist. v. Hill Sch.*, 786 A.2d 312, 319 (Pa. Cmwlth. 2001 (*en banc*)].

The requirement for notice by public proclamation first appeared in the Constitution of 1874.  The parties have not provided any history regarding this addition to the Constitution (nor has our own research been fruitful),[22] but, the requirement as originally adopted remains the same today. As noted by Respondents, other than mandating notice by public proclamation, the Constitution does not specify the form or substance of the notice.[23] To define the requirement, we must construe the term as it was commonly understood when adopted.[24] *Jubelirer*, 859 A.2d at 876.  In common parlance, a "proclamation" is "an official formal public announcement,"[25] or "a public or official announcement dealing with

---

[22] Prior thereto, the Constitution of 1838, provided in pertinent part: "If any bill shall not be returned by the Governor within ten days (Sundays excepted), after it shall have been presented to him, it shall be a law in like manner as if he had signed it, unless the General Assembly by their adjournment, prevent its return, in which case it shall be a law, unless sent back within three days after their next meeting."  PA. CONST. (1838), art. I, § XXIII.

[23] *See also In re City of Pittsburgh*, 66 A. 348 (Pa. 1907) (noting that Article III, Section 25 of our Constitution is silent regarding the manner in which the Governor, by proclamation, convenes a special session of the General Assembly and concluding that these are details for the Governor alone).

[24] While we are required to construe the language of the constitution "in its popular sense, as understood by the people when they voted on its adoption," *Jubelirer*, 859 A.2d at 876, we cannot ignore the customs and norms of present society, including the advancements in communication methods.

[25] http://www.merriam-webster.com/dictionary/proclamation.

22

a matter of great importance."[26] Thus, as commonly understood, a proclamation serves to give the public notice of governmental matters of import. *See also Lapeyre v. United States*, 84 U.S. 191, 201 (1872) (Justice Hunt dissenting) (noting that an essential element of the character of a proclamation is that "it should be openly and publicly made known.").

In *Dickinson, Auditor v. Page, Commissioner*, 179 S.W. 1004 (Ark. 1915), the Supreme Court of Arkansas examined various methods of proclaiming a matter of legal import, noting such has been accomplished by publication in newspapers (Presidential proclamation), oral announcement (election results) and posting a notice on the door of council chambers (mayor convening special session). After noting the various means of public announcement, the court stated:

> No particular form of proclamation is prescribed or indicated by the Constitution [of Arkansas], but only that "notice thereof be given by public proclamation," and from the authorities it appears that a proclamation is public when made and sufficient if it has such publicity, or accomplishes the end to be attained.

*Id.* at 1006-07.[27] *See also Lapeyre*, 84 U.S. at 198-99 (discussing publication and effective date of Presidential proclamation, noting: "[T]he established usage is to publish proclamations with the laws and resolutions of Congress currently in the newspapers, and in the same volume with those laws and resolutions at the end of

---

[26] http://www.oxforddictionaries.com/definition/english/proclamation. *See also Dickinson, Auditor v. Page, Commissioner*, 179 S.W. 1004 (Ark. 1915) [providing similar definition sourced from the New Standard Dictionary (Funk & Wagnalls)].

[27] In *Dickinson*, the Court was considering a constitutional provision for the return of a vetoed bill similar to the one at issue here. While the Court's discussion of general principles pertaining to public proclamation are helpful, we disagree with the Court's ultimate conclusion that the Governor's action in writing "vetoed and disapproved" across the bill and filing it in the office of the Secretary satisfied the requirement for notice by public proclamation.

the session. . . . [But] [a]s no mode of publication is prescribed . . . we do not see why applying the seal and depositing the instrument in the office of the Secretary . . . may not be held to have the same effect." In such case, "[i]t is there amidst the archives of the nation. . . . All persons desiring it can have access, and procure authenticated copies of both.").[28]

While there is little judicial authority in Pennsylvania discussing the constitutional requirement for public proclamation, we note that in 1915, the Attorney General rendered an opinion to the Governor regarding whether he could recall the disapproval of a bill that had been filed with the Secretary. In discussing the requirement of Article IV, Section 15, including notice of disapproval by public proclamation, the Attorney General opined:

> [The constitutional requirement for public proclamation] has been consistently followed since the adoption of the Constitution, and it has been the universal custom for the Governor to make public proclamation of all bills vetoed after the legislature has adjourned by reading, either in person or by a properly accredited representative, on the thirtieth day after the adjournment, in the rotunda of the Capitol, a proclamation substantially in the following form, which appears in all the Pamphlet Laws:

---

[28] In *Lapeyre*, the United States Supreme Court also looked at the historical English law regarding proclamations, observing that although there was a lack of express authority, "it should seem that if the proclamation be under the great seal it need not be made by any particular class of individuals or in any particular manner or place, and that it would suffice if it were made by anyone under the King's authority in the market-place or public street of each large town. It always appears in the gazette." *Id*. at 195-96. Speaking in 1872, the Court in *Lapeyre* observed that publishing via out-cry in the streets or market was no longer in use in England and had not been adopted in the United States. *Id*. at 198.

A Proclamation
"I (name of Governor), Governor of the Commonwealth of Pennsylvania, have caused this proclamation to issue, and in compliance with the provision of Article IV, Section 15, of the Constitution, do hereby give notice that I have filed in the office of the Secretary of the Commonwealth, with my objections thereto, the following bills passed by both Houses of the General Assembly, viz., Senate Bill No.  --, etc., etc."

Op. of Attorney General of Pa.: Recall of Bills Disapproved by Governor, 24 Pa. D. 544 (1915).  Casual commentary in our case law also indicates that executive proclamations appeared in the Pamphlet Laws. *See generally Commonwealth ex. rel. Schnader v. Liveright*, 161 A. 697, 702 (Pa. 1932) (providing citation to Governor's proclamation in Pamphlet Laws[29]).

Presumably, by mandating that all proclamations and executive orders of the Governor (with exceptions not relevant here) "shall be published in the [Bulletin]," *see* 45 Pa. C.S. § 725(a), our General Assembly has defined a standard for public proclamation.[30]  Indeed, there does not appear to be any dispute that executive proclamations are routinely published in the Bulletin, following a format similar to that provided in  101 Pa. Code § 101.363.  However, the Bulletin did not

---

[29] The official law of the Commonwealth is contained in the Laws of Pennsylvania, commonly referred to as the "pamphlet laws," which in bound form are known as the "Pamphlet Laws." 101 Pa. Code § 11.5.  The Laws of Pennsylvania, or Pamphlet Laws, contain, inter alia, laws, appropriation acts, joint resolutions, vetoes, proclamations and other documents required by law. *Id.*

[30] All documents required to be published in the Pennsylvania Code in addition to those documents specifically required to be published in the Bulletin, such as gubernatorial proclamations, first appear in the Bulletin, designated by statute as an "official gazette." 45 Pa. C.S. §§ 724, 725. The Bulletin is published "at least once each week and shall contain all previously unpublished documents duly filed prior to the closing date and hour of the issue . . . ." 45 Pa. C.S. § 724(b).

exist in 1874,[31] and public proclamation via publication in the Bulletin cannot legislatively be grafted onto the constitutional provision, thereby limiting the means of satisfying the requirement. Limiting or defining the drafters' intent is not the General Assembly's prerogative.

Considering that the purpose of a public proclamation is to provide an official announcement to the public of matters of governmental import and that the method used should be sufficient to achieve broad publicity, we conclude that a public press release issued by the Office of the Budget, an administrative agency within the Governor's office,[32] and available on the Commonwealth's website, satisfies the Constitutional requirement for notice by public proclamation. Indeed, the timely-issued press release generated by the Governor's offices provides more information than that which would be included in the generic form available in the Pennsylvania Code, and was certainly designed to reach more citizens than an announcement in the Capitol rotunda. More formality and a document under seal, as advocated by Senators, are not constitutionally required. By failing to provide for a form and manner of notice, the drafters left it to the discretion of the Governor to decide on the form of public proclamation best suited to the moment.[33] Moreover, it bears noting that while the meaning of "public proclamation" has not changed with the passage of time, the means of reaching the citizenry has, and we

_____

[31] *See* "About the Pennsylvania Code" (providing history and general information about the Pennsylvania Code and Bulletin) at http://www.pacode.com/about/preface.

[32] *See* Section 609 of The Administrative Code, Act of April 9, 1929, P.L. 177, added by the Act of September 27, 1978, P.L. 775, 71 P.S. § 229.

[33] *Compare* Article XI, Section 1 of our Constitution (providing that proposed Constitutional amendments, after the requisite agreement by each House, "shall be published three months before the next general election, in at least two newspapers in every county in which such newspapers shall be published . . . .").

cannot ignore that it is common practice for today's citizens to seek their news online. Accordingly, we conclude that the Governor provided the constitutionally-required notice of his objections.[34]

Finally, we turn to whether the FCA constitutes a "bill, making appropriations of money" for purposes of Article IV, Section 16. As noted, unlike bills providing for general legislation, which the Governor must approve or reject *in toto*, Section 16 permits the Governor to reject or veto individual items of appropriation, thereby only disapproving a bill in part. Senators maintain that the veto power provided by Section 16 is limited to bills authorizing the release of money from the treasury. For support, they cite Article III, Section 24 (providing that no "money shall be paid out of the treasury except on appropriations made by law"), *Washington v. Department of Public Welfare*, 71 A.3d 1070, 1085 (Pa. Cmwlth.), *aff'd*, 76 A.3d 536 (Pa. 2013) (noting that Article III, Section 24 gives the legislature "the exclusive power to authorize the release of money from the state treasury"), and *Common Cause of Pa. v. Commonwealth*, 668 A.2d 190, 205 (Pa. Cmwlth. 1995), *aff'd*, 677 A.2d 1206 (Pa. 1996) (defining an "appropriation bill" as a "measure before a legislative body authorizing the expenditure of public moneys and stipulating the amount, manner, and purpose of the various items of expenditure. . . ."). According to Senators, the FCA does not authorize the release of money from the public treasury. Rather, "it directs the conduct of agencies in using money that has already been appropriated by other enactments, such as the [GAA] of 2014." Petitioners' Brief in Support of Application for Partial Summary

---

[34] We note as an interesting aside, pursuant to 45 Pa. C.S. § 728, "no press release, speech, or other unofficial comments or news material shall be published in the code, the permanent supplements thereto, or in the bulletin."

Relief at 34 (emphasis omitted). Specifically, they note that each provision in the FCA that the Governor disapproved directed an agency in how funds that were already allocated were to be used. For example:

> Section 1716-J. Treasury Department.
>
> **From funds appropriated** for intergovernmental organizations, $45,000 shall be allocated for payment of dues for fiscal years 2013-2014 and 2014-2015 to a commission of the Atlantic coastal states that coordinates the conservation and management of near-shore fish species.
>
> I [the Governor] withhold my approval from this entire item.

*Id.* at 34-35 (emphasis in original). Senators maintain that the emphasized language clearly demonstrates that the FCA is addressing moneys that have already been appropriated; the FCA serves as an "'instruction manual' for the use of public funds that have been authorized for release by other legislation, [and therefore it does not constitute a bill 'making appropriations of money.]'" *Id.* at 37.

Senators find further support for the distinction between a bill appropriating money and one which subsequently directs the use of such funds in our decision in *Common Cause*, where this court stated, "the legislature is free to *appropriate*, subject of course to the constitutional procedures and prohibitions, and is also free to legislatively determine, *through substantive legislation*, the purposes to which appropriated funds are to be devoted . . . ." 668 A.2d at 206 (emphasis in original). Therefore, Senators contend, because the FCA does not appropriate money, the Governor lacked the constitutional authority to line item veto portions of the bill.

28

Relying on *Jubelirer v. Rendell*, 953 A.2d 515, 521 (Pa. 2008), Respondents define an "appropriation bill" as any bill making appropriations of money, and an "appropriation," as a provision directing that a specific sum of money be spent for a particular purpose. Respondents note that the GAA itself contains items of appropriation that allocate one large sum among multiple individual uses, similar to the allocations found in the FCA. According to Respondents, "there is nothing about the appropriations in the Fiscal Code Amendments that [differ], in a constitutionally significant way, from those in the General Appropriation Act. Because both sets of appropriations "direct that a specific sum of money be spent for a particular purpose, both are equally subject to the Governor's application of his Section 16 line item veto authority." Respondents' Brief in Opposition to Application for Partial Summary Relief at 28 (internal quotations omitted). Respondents further maintain that there is no distinction between the decision to appropriate funds and the determination of the purposes to which the appropriated funds are to be devoted. They contend, "it would make no sense to argue that the Governor could reduce the overall appropriation but not the individual allocations that, summed together, direct how that money is to be spent." *Id.* at 28 n.20. To allow the Governor to veto the former, but not the latter, would result in a budget that would be impossible to implement; departments would be directed to spend money in excess of that appropriated in the GAA.

Resolution of whether the Governor has constitutional authority to line-item veto separate provisions in the FCA, which direct a particular use of budgetary funds, requires not only construction of the term "appropriation," but consideration of the constitutional scheme, its history and purpose, and the

29

relationship between our general appropriations act and fiscal code amendments. After consideration of these factors, we agree with Respondents' contentions.

Pursuant to Article VIII, Section 12(a) of our Constitution, the Governor submits to the General Assembly a "balanced operating budget for the ensuing fiscal year setting forth in detail (i) proposed expenditures classified by department or agency and by program and (ii) estimated revenues from all sources."[35] The General Assembly adopts the budget, however, and determines operating budget appropriations. PA. CONST. art. VIII, § 13. As our Supreme Court observed in *Jubelirer v. Rendell*:

> Although the Constitution directs the Governor each year to "submit" a budget to the General Assembly, appropriations are to be "made by the General Assembly," and "no money shall be paid out of the treasury, except on appropriations made by law." So long as the General Assembly keeps the budget submitted by the Governor balanced, the Constitution allows the General Assembly to deviate as much as it wishes from the Governor's proposals. [As the Court

_____

[35] Prior thereto, and in aid of the Governor formulating the proposed budget, the Secretary of the Budget prepares and distributes budget request forms to the various departments, commissions, institutions, and bodies seeking State appropriations in order to procure information pertaining to the

> purposes of all programs to be funded in the budget, the revenues, expenditures, program activities and accomplishments for the preceding fiscal year, for the current fiscal year, and for the budget year . . . . [and also requiring the person returning the completed forms to provide] a statement in writing, giving the purpose of each program to be funded, the expected levels of activity of the programs, the expected levels of accomplishments and the measures to be used to determine to what extent the programs have achieved the stated purposes.

Section 610(a) of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, added by the Act of September 27, 1978, P.L. 775, 71 P.S. § 230(a). The Governor may approve, disapprove or alter the budget requests. Section 610(b), 71 P.S. § 230(b).

stated in *Shapp v. Sloan*, 391 A.2d 595, 604 (Pa. 1978) (plurality op.):] "[T]he General Assembly enacts the legislation establishing those programs which the state provides for its citizens and appropriates the funds necessary for the operation[ ] [while] [t]he executive implements the legislation by administering the programs." . . .

953 A.2d at 529 (citations omitted).

As noted, Article III, Sections 3 and 11 define the General Assembly's appropriation powers by exempting a general appropriation bill from the single subject limitation applicable to general legislation, and restricting the scope and subject matter of a general appropriation bill to specific areas of funding. In *Hospital & Health System Association of Pennsylvania v. Department of Public Welfare*, 888 A.2d 601 (Pa. 2005), our Supreme Court revisited the historical interplay and purposes of Sections 3 and 11. The Court noted that prior to the adoption of the single-subject rule, omnibus bills had become a "crying evil," preventing a focused, thoughtful legislative process. Unrestricted omnibus bills allowed incongruous subjects to be jumbled together, leading to "confusion and distraction of the legislative mind . . . and affording [ ] corrupt combinations of minorities with different interests to force the passage of bills with provisions which could never succeed if they stood on their separate merits [historically known as 'logrolling']." *Id.* at 608 [quoting *Commonwealth v. Barnett*, 48 A. 976, 977 (Pa. 1901)]. The practice of adding "riders," new, unrelated provisions, on appropriation bills also developed, forcing the executive to approve "obnoxious legislation, or bring the wheels of the government to a stop for want of funds." *Id.* at 608 (internal quotation omitted). These practices were eliminated with the adoption of Sections 3 and 11.

31

If strictly interpreted, Article III, Section 11 would allow nothing more than "a schedule of amounts appropriated and the objects of the expenditure." *Id.* at 609. However, Article III, Section 11 has not been applied so literally; language that is germane to the appropriation, not inconsistent with existing legislation (*i.e.*, it does not seek to change substantive law through an appropriations act rather than through the normal legislative course), and limited to the life of the appropriation bill, is permitted and will withstand constitutional challenge. *Id.* at 610 [discussing *Commonwealth ex. rel. Greene v. Gregg*, 29 A. 297 (Pa. 1894)[36] and *Biles v. Dep't of Pub. Welfare*, 403 A.2d 1341 (Pa. Cmwlth. 1979)].

Regarding the Governor's veto power, our Supreme Court noted in *Jubelirer* that, "[s]tanding in stark contrast to his role of administrator of state programs that have already been funded is the Governor's power to disapprove of legislation before it is enacted." 953 A.2d at 530. The Governor was not given the power to line-item veto legislation until the Constitution of 1873. *Id.* The Governor's general veto power to approve or disapprove an entire bill was intended to counterbalance the legislature's full control over every subject and provision in a bill, "at least a negative to the same extent." *Barnett*, 48 A. at 977. Article IV, Section 16 was intended to expand the executive's veto power; "it is a clear expression of intent to give the governor, to the extent of refusing approval, the same control over the particulars of a general appropriation bill that each house of the legislature had." *Id.* The Supreme Court of Connecticut, discussing its

---

[36] There, the Court upheld a provision in a general appropriations act authorizing employment of a clerk in the office of the Supreme Court prothonotary, noting that it was incidental to the main purpose of the appropriation, which is "to secure the performance of the regular and ordinary work of the office." 888 A.2d at 609 (quoting *Gregg*, 29 A. at 298).

Governor's item veto power under a constitutional provision similar to Section 16, observed as follows:

> [T]he obvious evil to which [the provision providing the executive with the power to disapprove any item or items of any bill making appropriations of money embracing distinct items] was directed was that of forcing the governor to accept items of appropriation, which from the standpoint of good government he felt should not be made, in order to preserve the bulk of an appropriations bill which he might feel largely consisted of proper items of appropriation without which the government could not operate. . . .
>
> [T]he fundamental reason why a partial disapproval or veto is not generally authorized, at least in the case of general legislation, is because of the separation of powers among the executive, legislative and judicial branches of the government. All affirmative legislative powers are given exclusively to the General Assembly. If the governor were allowed to disapprove or veto parts of a bill involving general legislation, he could, in the case of many if not most such bills, by the exercise of that power, eliminate selected portions of a bill in such a manner as to change its meaning and thereby, in effect, enact an entirely different bill. This would usurp the legislative function, which is committed to the General Assembly alone. But such legislative action through the use of the veto power would be impossible if the veto power were restricted to distinct items of appropriation in a bill, whether that bill did, or did not, include other items of general legislation.

*Jubelirer*, 953 A.2d at 531-32 [quoting *Patterson v. Dempsey,* 207 A.2d 739, 745-47 (Conn. 1965)]. It has also been suggested that Section 16 provides the Governor with the ability to reduce amounts appropriated in order to insure that a balanced budget is passed. *Id.* at 525 (noting party's citation to constitutional debates). In *Jubelirer*, the issue before the Court was whether the Governor had

33

the authority under Section 16 to disapprove of language only in an appropriation bill without disapproving the funds with which the language was associated.[37] The Court ultimately concluded that Section 16 does not permit the Governor, when passing upon an appropriations bill, to disapprove of only the language and not the relevant amounts appropriated. According to the Court, Section 16 authorizes only the disapproval of items of appropriation, which it defined in turn as "a sum of money directed by the General Assembly to be spent for a particular purpose." *Id.* at 534.[38] Although there was no question in *Jubelirer* that the bill at issue was a general appropriations act, the Court opined that the phase "[i]tems of any bill making appropriations of money," in Section 16 distinguished its application from that of Section 15, that is, Section 16 was intended to apply to appropriation bills and Section 15 to general legislation. *Id.* at 532.

The Fiscal Code defines the powers and duties of, inter alia, the Department of Revenue and the Treasury Department regarding the collection of all monies due the Commonwealth and the *"disbursement or other disposition of funds"* belonging to the Commonwealth or in its possession. Section 2 of The Fiscal Code, Act of April 9, 1929, P.L. 343, 72 P.S. § 2 (emphasis added). Our Supreme Court most recently observed that, in conjunction with the annual appropriations process, "the General Assembly has employed omnibus

---

[37] For instance, from a provision appropriating $137,393,000 to the State Police for general operations, the Governor disapproved of a provision that stated: "No Pennsylvania Police State barracks shall be closed until such time as the Pennsylvania State Police conduct a public hearing and provide 30 days' notice which shall be published in the Pennsylvania Bulletin and in at least two local newspapers." 953 A.2d at 519 n.4.

[38] In construing an item of appropriation, the Court noted the legal definition of "appropriation," that is, "a sum of money that a legislative body sets aside for a public purpose." *Id.* at 532 [citing Black's Law Dictionary 110 (8th ed. 2004)].

amendments to the Fiscal Code, for many years, as the enabling mechanism for financing state government operations and various programs." *Sears v. Wolf*, 118 A.3d 1091, 1094 (Pa. 2015). The process of adopting a capital budget "entails a myriad of difficult policy decisions, among competing interests, in determining fiscal priorities and attendant allocations. Adoption of a budget would be a hollow act in the absence of an implementing mechanism, here, the Fiscal Code." *Id.* at 1103.[39] Indeed, as in this case and historically, the Governor acts upon the two related pieces of legislation simultaneously. The interdependent relationship between the two acts is demonstrated by the preliminary findings set forth in the FCA:

> The General Assembly finds and declares as follows:
>
> (1) The intent of this act is to provide for the implementation of the 2014-2015 Commonwealth budget.

---

[39] It bears noting that in *Sears*, the 2010-2011 fiscal code amendments, specifically the Act of July 6, 2010, P.L. 279 (entitled, "Fiscal Code – Omnibus Amendments," and providing for, inter alia, implementation of the Commonwealth's operating budget for fiscal year 2010-2011) were challenged on constitutional grounds, including that the legislation violated the single-subject requirement of Article III, Section 3. Although the Court acknowledged the concerns were it to hold that the omnibus approach to implementing the budget was unconstitutional, it declined to resolve the issue, observing generally:

> Given the impact on many and varied interests . . . the omnibus approach facially appears to test the limits of the practical germaneness litmus which this Court conventionally applies to assess single-subject challenges. Moreover, without any limitations whatsoever, the practice would seem to be susceptible to the "logrolling" concern underlying Article III, Section 3's single-subject requirement. Accordingly, in an appropriate case, we may be required to determine whether judicial intervention is possible and/or appropriate and, if so, what may be the appropriate standards.

118 A.3d at 1103.

. . . .

4)   Pursuant to section 13 of Article VIII . . . the General Assembly is explicitly required to adopt a balanced Commonwealth budget. Given the unpredictability and potential insufficiency of revenue collections, various changes in State law relating to sources of revenue, the collection of revenue and the implementation of statutes which impact revenue may be required to discharge this constitutional obligation.

(5)   Section 11 of Article III . . . requires the adoption of a general appropriation bill that embraces "nothing but appropriations." While actual appropriations can be contained in a General Appropriations Act, the achievement and implementation of a comprehensive budget involves more than appropriations. Ultimately, the budget has to be balanced under section 13 of Article VIII of the Constitution of Pennsylvania. This may necessitate changes to sources of funding and enactment of statutes to achieve full compliance with these constitutional provisions.

(6)   For the reasons set forth in paragraphs (1), (2), (3), (4) and (5), it is the intent of the General Assembly through this act to provide for the implementation of the 2014-2015 Commonwealth budget.

(7)   Every provision of this act relates to the implementation of the operating budget of the Commonwealth for this fiscal year, addressing in various ways the fiscal operations, revenues and potential liabilities of the Commonwealth. To that end, this act places conditions on appropriations, provides for accountability for spending and makes any necessary transfers or other changes necessary to impact the availability of revenue or the fiscal conditions of the Commonwealth, in order to meet the requirements of section 13 of Article VIII . . .  and to implement the act of          , 2014 (P.L.   , No.  A), known as the General Appropriation Act of 2014.

36

*Id.*, Appendix Tab B at 2-3.[40]

Here, the Governor's disapprovals in the GAA and FCA correlate. For instance, in Section 210(7) of the GAA, pertaining to the Department of Conservation and Natural Resources, the Governor reduced the appropriation for "Heritage and Other Parks," from $2,750,000 to $2,250,000. PFR, Appendix Tab A at 247. In conjunction with this action, the Governor completely disapproved of Section 1720-J of the FCA (providing that the following shall apply to appropriations from the Department of Conservation and Natural Resources in the GAA), subsection (1), which stated: "From funds appropriated for Heritage and other parks, $500,000 shall be used for the operation and maintenance of the Washington Crossing Historical Park." *Id.*, Appendix Tab B at 72. Similarly, in Section 206 of the GAA, pertaining to appropriations for the operation of the Treasury Department, the Governor reduced the appropriation for "The Payment of the Commonwealth's Portion of the Expenses of Various Councils, Commissions, Conferences, Boards, Associations, Coalitions and Institutes which are Multistate Organizations of which the Commonwealth Has Been a Member for at Least One Year and which Membership Enables the Commonwealth Government to Represent the Citizens of [PA,] Such Organizations Being Designed to Promote or Protect the Member States' Interests, or which Promote Governmental Financial Excellence or Accountability," from $1,081,000 to $1,036,000. In connection therewith, the Governor disapproved of Section 1716-J of the FCA, which stated:

---

[40] The complexity of achieving a comprehensive balanced distribution of funds to operate the Commonwealth's government and programs via the coordination of provisions between the general appropriations bill and fiscal code amendments is also demonstrated by our decision in *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 108 A.3d 140 (Pa. Cmwlth. 2015), *reargument denied* (February 3, 2015).

"From funds appropriated [to the Treasury Department] for intergovernmental organizations, $45,000 shall be allocated for payment of dues for fiscal years 2013-2014 and 2014-2015 to a commission for the Atlantic coastal states that coordinates the conservation and management of near-shore fish species." *Id.*, Appendix Tab B at 70. The result of such coordinated, symmetrical actions clearly serves to keep an agency's or department's operations, as ultimately funded in the GAA, within the confines of its appropriation.

Considering the above constitutional framework, the process established for the adoption of a budget and the Governor's role therein, including his unique power of disapproval in the appropriations context, we conclude that the FCA constitutes a "bill making appropriations of money, embracing distinct items," for purposes of Article IV, Section 16. In reaching this conclusion, we define an "appropriation" as a sum of money that the legislature designates for a particular public purpose. This definition (stemming from Black's Law Dictionary) mirrors the Supreme Court's construction of the term in *Jubelirer v. Rendell*, 953 A.2d at 532 (quoting Black's; *see* footnote 39 above), and our construction of the term in *Common Cause*, 668 A.2d at 205 (quoting Black's; citation omitted), and *County of Mercer v. Amundsen*, 879 A.2d 366, 369-70 (Pa. Cmwlth. 2005) (citing *Common Cause*). The fact that the FCA serves to further define the legislature's prior allocation of funds does not preclude the allocation from constituting an "appropriation," or the FCA from constituting a "bill making appropriations of money."[41] As to the latter observation, following *Common Cause*, we also adopt

_____

[41] The fact that the FCA contains more than appropriations does not change our conclusion either. Article IV, Section 16 applies to *any* bill that makes appropriations of money. Whether the FCA comports with applicable constitutional requirements is not before us. *See Jubelirer*, 953 A.2d at 536 (noting that it was not the Court's task to determine whether the failure to strike **(Footnote continued on next page…)**

38

Black's legal definition for an "appropriation bill:" "A measure before a legislative body authorizing the expenditure of public moneys and stipulating the amount manner, and purpose of the various items of expenditure . . . ." 668 A.2d at 205 (quoting Black's). There is simply no reason to deviate from our sound precedent.

Our construction today is also consistent with the manner in which the term "appropriation" is used in other constitutional provisions, to wit: Article III, Section 29 (providing: "No appropriation shall be made for charitable, educational or benevolent purposes to any person or community nor to any denominational and sectarian institution . . . . Provided, That appropriations may be made for pensions or gratuities for military service and to blind persons . . . ."); Article III, Section 30 (providing: "No appropriation shall be made to any charitable or educational institution not under the absolute control of the Commonwealth . . ."). The term "appropriation" in these provisions means the legislature's designation or allocation of funds to a particular purpose; the limitation on purpose or use applies to both the initial appropriation to an agency or department in a general appropriation act and to subsequent legislation directing funds to a particular purpose. We agree there is no substantive distinction between the two; both involve an act of legislature authorizing a use of public funds for a particular purpose. This comports with Article III, Section 24 ("[n]o money shall be paid out of the treasury, except on appropriations made by law and on warrant issued by the proper officers . . . .") as well. Specifically designating funds for a particular

---

(continued…)
particular language from a bill would leave it susceptible to a challenge under other provisions of the Constitution.).

purpose in the FCA is clearly an "appropriation made by law;" it authorizes the executive branch to use the funds for the means directed.

Finally, deeming the FCA as a "bill making appropriations of money," serves the purposes of the constitutional scheme outlined for our tripartite government. While the Governor is not empowered to interfere with the legislative power to craft the purpose and scope of general legislation via a partial veto, he has been empowered with the ability to disapprove of specific items of appropriation in a bill making appropriations of money – that is, he can disapprove of any provision in a bill directing funds to be spent for a particular purpose, thereby exerting a greater influence and measure of control (i.e., his limited legislative authority in the appropriations context) in achieving a budget acceptable to all sides. Such limited legislative power would be essentially meaningless if it could be exercised in the context of the GAA, but not with regard to related or coordinated provisions in the FCA. Such a conclusion would leave the Governor with only the option of disapproving the entire FCA, effectively derailing many of the general appropriations approved, a result inconsistent with the language of Article IV, Sections 15 and 16, and the intended purposes thereof. Accordingly, we conclude that the Governor had the authority under Article IV, Section 16 to disapprove of items of appropriation in the FCA. Summary relief is therefore denied.

_____
**BONNIE BRIGANCE LEADBETTER,**
Judge

Judges Leavitt and Brobson did not participate in the decision in this case.

40

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joseph B. Scarnati, Senator and     :
President pro tempore of the Senate of     :
Pennsylvania; Jake Corman, Senator     :
and Majority Leader of the Senate of     :
Pennsylvania; Jay Costa, Senator and     :
Minority Leader of the Senate of     :
Pennsylvania,     :
                   Petitioners     :
    :
            v.     :     No. 579 M.D. 2014
    :
Tom Wolf, Governor of     :
Pennsylvania; Randy Albright,     :
Secretary of the Budget; Christopher     :
Craig, Acting State Treasurer of     :
Pennsylvania; Dennis M. Davin,     :
Acting Secretary of Community and     :
Economic Development; Cindy     :
Adams Dunn, Acting Secretary of     :
Conservation and Natural Resources;     :
John Quigley, Acting Secretary of     :
Environmental Protection; Curtis M.     :
Topper, Acting Secretary of General     :
Services; Kathy Manderino, Acting     :
Secretary of Labor & Industry;     :
James R. Joseph, Acting Adjutant     :
General of Pennsylvania; Josh     :
Shapiro, Chairman of the     :
Pennsylvania Commission on Crime     :
and Delinquency,     :
                   Respondents     :

# **O R D E R**

AND NOW, this 30th day of December, 2015, Respondents' preliminary objections are hereby OVERRULED.  Further, Petitioners' application for summary relief is also DENIED.  An answer is due in thirty days.


_____
**BONNIE BRIGANCE LEADBETTER,**
Judge